UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
-----------------------------------------------------------------x
DR. DARE ADEWUMI,

        Plaintiff,                                                                COMPLAINT

vs.

WELLSTAR MEDICAL GROUP and WELLSTAR
HEALTH SYSTEMS, INC. & NORTHSIDE
HOSPITAL, INC.,

        Defendants.
-----------------------------------------------------------------x

By and through his counsel, Law Offices of C.K. Hoffler and Michael H. Sussman, Esq., plaintiff alleges against defendants as follows:

I. PARTIES

1. Plaintiff is an African doctor of dark skin color. He resides within this judicial district and has done so at all relevant times.

2. Defendant Wellstar Medical Group and Wellstar Health Systems, Inc. [hereinafter collectively referred to as "Wellstar"] are employers conducting business within this judicial district. They may sue and be sued.

3. Defendant Northside Hospital, Inc. is a hospital doing business within this judicial district. It may sue and be sued.

II. JURISDICTION

4. As plaintiff alleges that defendants intentionally discriminated against him in the terms and conditions of his employment on account of his race and treated him in a manner unlike the way they contracted with similarly situated Caucasian doctors, this Court has

1

jurisdiction over this matter pursuant to 28 U.S.C. sections 1331 and 1343 so as to enforce 42 U.S.C. section 1981-a which assures an African American person the same right to contract as a white person. As plaintiff filed a charge of unlawful discrimination based on race/color with the EEOC on or about July 15, 2020, received a right to sue letter on July 13, 2021, and timely initiates this action, this Honorable court has jurisdiction over this matter pursuant to 42 U.S.C. section 2000-e, et seq. See Exhibits 1 and 2 attached hereto for plaintiff's charge of discrimination and the right to sue letter.

### III. FACTUAL ALLEGATIONS

5. Plaintiff's family is from Nigeria.

6. Plaintiff went to college and medical school in the United States.

7. At all times relevant to the events set forth herein, plaintiff was a board-eligible neurosurgeon.

8. On March 19, 2018, plaintiff signed a Physician's Service Agreement with defendants Wellstar to lead their Neurosurgery line of service at Wellstar Cobb Hospital, one of eleven hospitals they then operated.

9. Dr. William Benedict ran the service line in which plaintiff worked and plaintiff reported to him.

10. From the commencement of this employment, defendant Wellstar assigned plaintiff to work in a different hospital setting, Wellstar Cobb, than Dr. Benedict, who worked at Wellstar Kennestone Hospital.

11. Months after he commenced working for it, defendant Wellstar began providing plaintiff with letters of inquiry raising issues which allegedly had occurred during surgeries he performed.

12. Such letters of inquiry may be filed by anyone anonymously and the target physician is not advised of the source of the letter.

13. Each such letter of inquiry is typically reviewed by a peer review committee.

14. Normally, after receiving such a letter of inquiry, the named doctor is permitted to submit a response before the Medical Executive Committee determines whether additional independent scrutiny is needed concerning the alleged incident.

15. As he was receiving these letters, plaintiff began complaining to Dr. Alan Muster, a senior vice president to whom Dr. Benedict reported.

16. Plaintiff explained that he was not receiving support from the service line as he was attempting to re-establish neurosurgery services at Wellstar-Cobb, the hospital to which he had been assigned as lead [and the sole] neurosurgeon.

17. In response, Dr. Muster repeatedly suggested that plaintiff resign and offered no concrete assistance.

18. Plaintiff also requested that the letters of inquiry be reviewed by the Neurosurgery Department, not merely by Dr. Benedict.

19. Dr. Benedict adamantly refused to have anyone else review these letters and continued to alone conduct the required peer review function.

20. Acting as the peer review committee, Dr. Benedict deemed five of the nineteen letters of inquiry worthy of external review.

21. In four of these five cases, the external reviews noted concerns regarding plaintiff's approach or surgical technique; however, in none of these did the external reviewer suggest that plaintiff had breached any standard of patient care or safety.

22. In the fifth case, the external review yielded no concerns.

23. An independent review conducted by a nationally known neurosurgeon confirmed that plaintiff had engaged in no conduct inconsistent with established standards for patient care in any of these cases.

24. In August 2019, based on the number of letters of inquiry and instigated by Dr. Benedict, defendant Wellstar placed plaintiff on a year-long Action [performance improvement] plan.

25. As more than three-quarters of the letters of inquiry raised no issue even worthy of external review and the other five for which external review was conducted provided no evidence of deviations from accepted standards of medical care, requiring an Action Plan on this basis was pretextual.

26. Defendant Wellstar did not so treat white doctors who engaged in like practices or worse, failing to either prepare letters of inquiry, as the department chair could do, to initiate external reviews or to place them on such Action Plans.

27. In one such case, Dr. Phillip Parry, a Caucasian neurosurgeon, caused unnecessary "emergency" surgery to be performed on an 83-year-old patient based on information he had received and reviewed days before pressuring a junior physician to perform this surgery.

4

28. Even after plaintiff made both Dr. Benedict and Dr. Muster aware that Dr. Parry had misrepresented his own care of this patient and caused this unnecessary surgery, Dr. Benedict not initiate any review of this case.

29. Instead, he reprimanded plaintiff for not seeing the patient in the Emergency Department, though three days earlier, based upon the same diagnostics, Dr. Benedict himself had not seen this patient in the Emergency Department.

30. Defendant Wellstar claimed that completing the assigned Action Plan would help better integrate plaintiff with neurosurgeons working within the much larger Kennestone Hospital Neurosurgery Department.

31. Desiring to establish himself with these physicians, plaintiff accepted the Action Plan.

32. Weeks after accepting the Action Plan, in late August 2019, plaintiff met with leaders of the Cobb Hospital MEC for a check in; they praised his work toward completing required Action Plan items, noted that he was ahead of schedule and suggested the possibility of releasing plaintiff early from it.

33. When plaintiff inquired further about the latter possibility, MEC members indicated that this action was within its discretion and noted that they had done so before.

34. At this same review meeting, plaintiff complained of unfair judgments reached against him by Dr. Benedict and discussed at least one specific instance of conduct manifesting this unfairness.

35. MEC members agreed with plaintiff and assured him that Dr. Benedict would not be permitted to sabotage his successful completion of the Action Plan.

36. MEC members also told plaintiff to document his own work and noted that Dr. Benedict would not be preparing the report of plaintiff's mentoring experience at Kennestone.

37. In fact, Dr. Benedict did eventually complete this final report, making adverse remarks about plaintiff's care of the 83-year-old patient referenced in paras. 27-29 above.

38. Following his late August 2019 meeting with the MEC, plaintiff continued to avidly comply with the CME requirements of the Action Plan and received very positive feedback during his three months on it.

39. However, rather than use the Action Plan to collegially mentor plaintiff, Dr. Benedict used it as a punitive mechanism, stating that he would make plaintiff's time at Kennestone "like residency" all over again.

40. Between August and October 2019, despite Dr. Benedict's hostile and vindictive approach, plaintiff did not receive a single letter of inquiry.

41. However, without prior notice, on October 8, 2019, Dr. Muster gave plaintiff a "no cause" termination letter advising that defendant Wellstar intended to terminate his employment effective April 5, 2020.

42. During his discussion with plaintiff, Dr. Munster agreed that Dr. Adewumi had done "nothing wrong" and told plaintiff he was being fired because "certain relationships were not fostered," and that the neurosurgery team had reached a consensus to terminate his contract.

43. The latter representation was false and pretextual as the Neurosurgery team had not reached any such consensus and no meeting of the neurosurgery team at Kennestone was held to consider the issue of terminating or non-renewing plaintiff.

44. At the time he received this letter, plaintiff had completed all aspects of the Action Plan except six weeks of mentoring at Kennestone.

45. After October 8, 2019, defendant Wellstar disallowed plaintiff from completing this mentoring, violating provisions of their contract which required defendant to provide plaintiff with office space, supplies and staff during the full term of his agreement.

46. Instead of honoring this provision, after providing plaintiff the "termination notice," defendant Wellstar did not allow him to return to work so he could complete the Action Plan, a condition precedent to his receipt of a "letter in good standing".

47. And, compounding this, defendant Wellstar affirmatively represented that it would advise prospective employers that plaintiff was NOT in good standing because he had not completed the Action Plan.

48. During the next several months, plaintiff sought to resolve these issues and mitigate the enormous reputational damages defendant Wellstar was inflicting, and threatening to inflict, upon him, requesting either leave to complete his mentoring at Wellstar Cobb or, absent that, a decision by the Cobb MEC that he had completed his Action Plan.

49. But nothing worked, and defendant Wellstar refused to allow plaintiff to mitigate his damages.

50. Defendant Wellstar did not similarly separate white doctors with performance concerns similar to those noted for plaintiff.

7

51. After being advised that he was being so terminated, plaintiff sought, but was never provided, the letter of good standing he needed to pursue his career.

52. Defendant Wellstar's failure to provide this letter cast a cloud which has hampered plaintiff's substantial efforts to gain comparable employment.

53. After being so terminated, plaintiff sought, but could not find, comparable employment.

54. In July 2020, plaintiff did accept a six-month Locums Tenens contract with another employer, defendant Northside Hospital Inc., at a salary commensurate to that he had earned at Wellstar.

55. However, before securing this employment, plaintiff was entirely out of work, costing him approximately $250,000 in monetary loss.

56. In the fall 2020, without explanation, defendant Northside advised plaintiff that it would not offer him available full-time employment in which he expressed interest and for which he fully qualified.

57. Defendant Northside so refused to contract with plaintiff despite his fully satisfactory performance during his six-month contract, his express request to be considered for an available position in the department and the availability of vacant positions within his specialty.

58. Indeed, during his employment, plaintiff took on leadership roles and performed functions above those expected or asked of him.

59. Plaintiff also worked to mend damages relationships between the Neurosurgery and Radiology Departments.

60. Plaintiff also attended trauma committee meetings to help the hospital maintain its trauma designation.

61. Plaintiff took more calls than other similarly hired physicians and was repeatedly asked to back-up physicians unable to take their shifts.

62. However, despite his superior qualifications and proven record of performance, instead of offering plaintiff an available full-time position, defendant Northside offered it to a Caucasian, Evan Winograd, M.D., who had also worked as a Locums Tenens, but lacked plaintiff's practice experience and demonstrated competency while in its employment.

63. In January 2021, as he sought comparable employment, a hospital in Dayton, Ohio advised plaintiff that Wellstar Cobb had advised that he was subject to an Action Plan where his privileges were automatically resigned due to his failure to satisfy the threshold eligibility criteria on a continuous basis.

64. Upon information and belief, defendant Wellstar similarly hindered plaintiff's ability to secure comparable employment, causing him pecuniary and non-pecuniary damages.

65. Defendants' actions have intentionally and wantonly caused plaintiff substantial emotional distress and mental anguish, humiliated him, and substantial pecuniary loss.

66. By dint of defendant's discriminatory practices, plaintiff will continue to experience all of these adverse consequences.

## IV. CAUSES OF ACTION

67. Plaintiff incorporates paras. 1-66 as if fully restated herein.

68. By and through the alleged conduct, defendant Wellstar intentionally and wantonly violated plaintiff's right to engage in a contract with it on the basis of his race in violation

of 42 U.S.C. section 1981-a, terminating his contract with it on grounds not deemed sufficient to treat similarly qualified and situated white doctors.

69. By and through its conduct and on the basis of plaintiff's race, defendant Wellstar intentionally interfered in his obtaining a contract with other employers on the same basis that Caucasian doctors were so employed, thereby violating 42 U.S.C. section 1981-a.

70. By and through the conduct set forth above, defendant Northside intentionally and wantonly violated plaintiff's right to engage in a contract on the basis of his race in violation of 42 U.S.C. section 1981-a.

71. By and through the actions and omissions set forth above, defendants violated Title VII of the Civil Rights Act by subjecting plaintiff to disparate terms and conditions of employment on the basis of his race/color and by terminating his employment on the same illegal bases.

## V.  PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this Honorable Court accept and take jurisdiction over this matter, empanel a jury to hear and decide all issues within its authority, award to plaintiff compensatory and punitive damages as permitted by law for the violation of his civil rights, award to plaintiffs' counsel reasonably incurred attorneys' fees and litigation costs and disbursements pursuant to 42 U.S.C. section 1988, and enter any other order required by law or equity.

Dated:    September 30, 2021

Respectfully submitted,

*Tricia (CK) Hoffler* — BA.
TRICIA (CK) HOFFLER
The CK Hoffler Firm
23 Lenox Pointe, N.E.
Atlanta, GA 30324
Co-Counsel for Plaintiff

*Michael H. Sussman* — BA.
MICHAEL H. SUSSMAN
Sussman & Associates
PO Box 1005
Goshen, NY 10924
(845)-294-3991
Co-counsel for Plaintiff