# EXHIBIT A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | FEPA | 410-2020-0663 4 |
| | X   EEOC | |
| | and EEOC | |

| | State or local Agency, if any | |
|---|---|---|

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Dr. Dare Adewumi** | **504-237-2735** | ▬▬▬▬ |

| Street Address | City, State and ZIP Code |
|---|---|
| **3464 Roxboro Road Unit 1902, Atlanta, GA 30326** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **Wellstar Health System** | **20,000** | **470-644-0020** |

| Street Address | City, State and ZIP Code |
|---|---|
| **793 Sawyer Road, Marietta GA 30062** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON *(Check appropriate box(es).)*

RACE  COLOR  SEX
 x      x

RETALIATION  AGE  DISABILITY  GENETIC INFORMATION
              OTHER *(Specify)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest                    Latest

Earliest 3/19/2018
Latest 4/5/2020

☐ Continuing Action

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |

SUBSCRIBED
AND SWORN TO
BEFORE ME THIS
DATE
*(month, day, year)*

7/15/2020

*Date*

*Charging Party
Signature*

EEOC Form 5 (11/09)

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

Charge Presented To:

X

State or local Agency, if any

Agency(ies) Charge No(s):

FEPA

EEOC          **410-2020-0 6634**

and EEOC

THE PARTICULARS ARE *(if additional paper is needed, attach extra sheet(s)):*

Please see draft of charge attached.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

NOTARY – *When necessary for State and Local Agency Requirements*

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

7/15/2020

*Date*

*Charging Party Signature*

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)*

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1.   FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

**2.   AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

**3.   PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4.   ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5.   WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it

## **DRAFT EEOC Charge of Discrimination**

My name is Dr. Dare Adewumi. I am a dual Fellowship-trained Neurosurgeon with over 10 years of experience. On March 19, 2018, I signed a Physician's Services Agreement ("Agreement") with **WellStar Medical Group ("WMG")** and **WellStar Health Systems, Inc. ("WHS")** to lead their Neurosurgery "line of services" at one of their 11 Hospital locations, **WellStar Cobb Hospital ("WHS Cobb").** (*See* Attachment #1). On October 8, 2019, WMG/WHS notified me that they were terminating my employment "not for cause," effective April 5, 2020 (*see* Attachment #2) after I repeatedly complained about Dr. Bill Benedict's continued targeting and disparate treatment of me, especially compared to other WMG's Neurosurgery Division.

WMG and WHS have continued to engage misconduct even after terminating me, including refusing to issue me the "Letter in Good Standing" that I need for future hospital credentialing, and making false statements about my surgical abilities and judgment. These actions will prevent me from being hired as a neurosurgeon <u>anywhere in the country</u>, <u>for the foreseeable future</u>, simply because I am black. Even more egregious, they are preventing me from providing <u>critical</u> medical services to my community at the height of the COVID-19 Pandemic. I believe that their illegal actions are part of a wider pattern and practice of discrimination against African-American doctors, including at least five other African-American physicians that I learned of during my short tenure, each of whom WMG/WHS also targeted through adverse employment and/or hospital credentialing actions. In addition to loss of income, WHS/WMG's actions continue to cause me significant emotional distress.

### WHS/WMG Joint Employment

Despite WMG's repeated claims that it has "no influence" over the acts of WHS Cobb, and vice versa, WMG and WHS acted as my joint employers and as an "integrated enterprise" at all times. They are both parties to my Agreement, which states that failing to maintain WHS credentials constitutes breach of my Agreement and will result in immediate termination from WMG. WHS's website states that it *formed* WMG to provide "hospital-employed physicians" for its Health System and they share common management, administrative, and operational overlap.[1] *See* www.wellstar.org/about-us/pages/wellstar-medical-group.aspx Additionally, everyone in management at WMG is also connected to WHS, and there are numerous conflicts of interest between them, making a fair and impartial investigation into their misconduct nearly impossible, for example:

- Within WMG, my supervisory structure includes Dr. Benedict (Caucasian; American), WHS Kennestone Neurosurgeon who oversees WMG's Neurosurgery Division. His supervisor is Dr. Alan Muster (Caucasian; American), WMG Pulmonologist and Sr. VP of Specialty Medical Services.

- Within WHS, my supervisory structure includes Dr. Jody Hughes, WHS Cobb Chief of Staff and Chair of WHS Cobb's Medical Executive Committee ("MEC"). He is also employed by

---

[1] Traditionally, physician's practices and hospitals operate as separate entities with little overlap—with the private physician's group providing office or clinical space to see patients for check-ups, diagnostics, pre- & post-op visits, etc., and performing billing and administrative functions for those services; and the hospital providing "credentials" (or "privileges") that allow you to operate and admit your patients for surgery/treatments/testing, and performing billing and admin support for those procedures.

1

WMG as a Pulmonologist, where he works with, and under the supervision of, Dr. Muster.

- WHS Cobb's MEC has oversight responsibility over all hospital-physician relationships and credentialing. Dr. Benedict served as an *ad hoc* member because they had no other neurosurgeons before I arrived.

These overlaps in WMG and WHS's supervisory/oversight structure, made it much more difficult to seek help when I needed it, and allowed them to coordinate their actions to deprive me of the opportunity to seek employment elsewhere. I believe that if you were to subpoena their emails and text messages, you would see coordination between the two entities for this purpose (*see e.g.* Attachment 3, the last email sent to me, by Dr. Muster from WMG, stating that I may not contact Cobb's MEC or Dr. Hughes, and that he would notify them of the decision, on behalf of WMG, that they would not grant my request to return to work to assist with the COVID-19 crisis at WellStar Cobb Hospital or any other WellStar hospital).

<u>WHS Cobb/WMG Recruitment and Hiring</u>

WHS Cobb recruited and selected me to lead and manage the neurosurgery "service line" at Cobb. At the time I was hired, WHS Cobb had not had a neurosurgeon operating out of WHS Cobb for approximately 10 years. My training and work history made me well-qualified to lead this function at WHS Cobb, and I was excited for this new role. I understood WHS Cobb's decision to bring me in for this purpose was based on two main factors: (1) having these services in-house was better for our patients; and (2) every time WHS Cobb referred a patient somewhere else, it lost revenue. Before my hire, most of WHS Cobb's neurosurgery patient referrals were sent to **WellStar Kennestone Hospital ("WHS Kennestone")**, the main Hospital for most of WMG's Neurosurgeons, including Dr. Benedict.

**Race and National Origin Based Hostile Work Environment:** My reception upon arrival at WMG was a bit icy but for the most part, uneventful. I was later told by several people that my colleagues at WHS Kennestone were upset by WHS Cobb's decision to hire me/develop neurosurgery service line because they did not get Dr. Benedict's full blessing, and because Kennestone was losing referral revenue to WHS Cobb. WHS Cobb's leadership also told me that a lot of the negativity I had experienced was a result of their failure to properly "integrate" me with the WHS Kennestone group, specifically Dr. Benedict.

As I continued to work in my role, I was subjected to an increasingly hostile work environment, primarily at the hands of Dr. Benedict (Caucasian; American) who, with the help of others at WHS and WMG including Dr. Muster (Caucasian; American), targeted me with the intention of undermining my skill as a physician and pushing me out of the group. WMG/WHS's abusive and harassing tactics included:

(1) Making demeaning or belittling comments about my skillset in front of my peers, and spreading negative rumors about my reputation as a surgeon and how I ran the neurosurgery program at WHS Cobb.

(2) Drafting and circulating inaccurate and biased "peer review" reports and assessments that they later used as the excuse for placing me on an "Action Plan."

(3) Inducing me to sign an "Action Plan" under false pretenses that it was not punitive.

2

(4) Suggesting more than once that I resign from my position rather than deal with the harassment I was experiencing.

(5) Terminating my employment under the "No Cause" provision, which deprived me of due process rights to appeal the adverse actions taken against me.

(6) Refusing to allow me to return to work during my six-month "No Cause Termination" Notice Period so that I could complete their Action Plan (which they claimed I had to do in order to be given a "Letter in Good Standing."

(7) Refusing my requests to work outside of the WMG-relationship or find a way for me to complete their Action Plan elsewhere, thus depriving me of any way to obtain a "Letter in Good Standing" so that I could seek employment elsewhere.

This conduct occurred for over a year while I repeatedly raised concerns with Dr. Muster, Dr. Hughes, and others members of WHS Cobb's MEC about Dr. Benedict and other misconduct.

**Race and National Origin Discrimination:** Throughout my employment, I have been subjected to increased scrutiny and adverse actions that similarly-situated non-African American/Nigerian physicians were not. Prior to joining WHS and WMG, I had an unblemished record and no Letters of Inquiry. This changed in November 2018, just as my practice at WHS Cobb had started to gain momentum.

Letters of Inquiry leading to Action Plan: In November 2018, WHS Cobb began sending me notices of "Letters of Inquiry"[2] about surgeries I performed. Ultimately, I received fifteen (15) LOIs between November 2018 and June 2019, a pattern that concerned me given my track record.[3]

Out of the 15 LOIs, WHS Cobb only sent out five for an additional, independent review, and only four came back notating any concerns. Of those four, the "concerns" were limited to differences in opinion as to the proper approach or surgical technique to use, and record-keeping, nothing close to suggesting a breach in patient care standards, much less patient safety. This was confirmed by a second independent reviewer.[4]

---

[2] "Letters of Inquiry" ("LOI") are reviewed by the hospital's MEC who looks at the reported physician's handling of a particular procedure or patient. Any member of the medical staff can file an inquiry, or they can be triggered by a patient complaint. At WHS Cobb, this process is overseen by Cobb's MEC and WHS Cobb's "Quality Improvement Department," who provides administrative support. I do not know who filed the inquiries against me, except that all but one were not patient-generated; meaning 14 were filed by colleagues.

[3] I had never received a Letter of Inquiry prior to joining WMG/WHS. I also received no LOIs between my hire in March 2018 and November 2018. Strangely, I also received zero LOIs after I was placed on the Action Plan, indicating a coordinated effort to file enough LOIs to encourage disciplinary action against me based on minor disagreements regarding surgical technique which would normally not be reported in an LOI.

[4] My lawyers were referred to Dr. Ware, a Harvard-trained, nationally-recognized neurosurgeon, to review the LOI Findings that WHS/WMG claim justified placing me on an Action Plan. I have no prior relationship with this doctor and he was not paid for this review. He concluded that findings of "concern" dealt solely with differences in opinion on surgical approach or techniques, which could differ based on where or how long ago you were trained. He also noted that these

The 15 LOIs demonstrate the bias held against me as an African-American/Nigerian neurosurgeon (particularly one who was brought in to lead the WHS Cobb neurosurgery team), and were filed against me with discriminatory intent to discredit my training and skills as a surgeon, and ultimately to push me out of WMG/WHS. WHS never addressed the fact that a high number of unsubstantiated LOIs were filed against me. Instead, with the assistance and input of WMG, WHS presented me with a 1-year Action Plan, purportedly in response to the four LOIs with "findings."

Non-African American/Nigerian physicians did not endure this type of treatment. In fact, I can identify at least two surgeries or procedures that were either medically unnecessary or resulted in permanent disfigurement to the patient, falling well below the patient standard of care. Yet the physicians who performed those surgeries are still employed by WMG and, to my knowledge, were not subjected to any Letters of Inquiry, Action Plans, and/or disciplinary action. This is evidence that others outside of my protected class were given preferential treatment.

Acceptance & Substantial Completion of Action Plan: I initially rejected the Action Plan but WHS told me that the Action Plan was not meant to be "punitive," but rather, a way to "better integrate" me into the main group of neurosurgeons WHS Kennestone. They said that they had done a poor job of this when I was hired and insinuated that this might be one of the reasons that Dr. Benedict subjected me to more scrutiny than my peers. At that point, I just wanted to get back on track with my job and peers, and I did not want to be viewed as refusing their offer to help improve things. I took them at their word that this was the best way to improve my work environment, and, based on their assurances that it was not punitive, I agreed to the Action Plan.

Looking back, placing me on an Action Plan seems like a ridiculous way to address their failure to onboard me correctly. The only way this makes sense is if the Action Plan was done to appease Dr. Benedict, who had tried twice before transition me to WHS Kennestone for a few months to "work under him" (also one of the "action" items in my Plan). (See "Supplemental Charge Facts").

As soon as I was placed on the Action Plan, I began completing the action items as quickly as possible to demonstrate my commitment to the process. During this time, however, I continued to be subjected to Dr. Benedict's disrespectful behavior and unwarranted scrutiny. (See id.)

In August 2019, I met with leaders from Cobb's MEC for my required "Action Plan Check-In." They praised my completion of my required items, noted that I was ahead of schedule, and stated that based on this, they might be able to release me from the Action Plan early. When I asked if that was really possible, they said it was within the MEC's discretion and they have done it before.[5]

I thanked them for their assurances, but I reiterated previous concerns about Dr. Benedict's continued unfair targeting and scrutiny, and how that might undermine my ability to complete the

---

concerns could only be credibly asserted by a surgeon who was in the operating room to observe all of the facts and circumstances surrounding that patient's surgery at the time that my decisions were made.

[5] The majority of the conversations referenced herein are recorded, including this one. I began to record my conversations after I became concerned that Dr. Benedict was trying to push me out.

Action Plan since it required the WHS Kennestone Group's sign-off. I even provided a specific example of patient incident that Dr. Benedict tried to accuse me of mishandling when the facts clearly showed otherwise. They agreed to my assessment of Dr. Benedict's unfair accusation involving the patient incident and promised that they would not let Dr. Benedict tank my Action Plan. They even advised me to create additional documentation regarding my patient interactions that they could use to counteract anything negative that Dr. Benedict did or said regarding my Action Plan. I was also told that Dr. Benedict would not be writing WHS Kennestone's report about my "mentorship" there. Based on these assurances, I continued to work on completing my Action Plan, even though Dr. Benedict continued to target me. (See id.)

Termination Before Action Plan Could Be Completed: On October 8, 2019, Dr. Muster presented me with a letter stating that WMG was terminating my employment "not for cause." (Attachment 2). This letter was a complete shock to me. This was just two months after my August Check-In where I was praised for my progress. I had completed all Action Plan items with the exception the final 6 weeks of "mentoring" at WHS Kennestone. There were no new LOI or other credible performance issue identified between the August 2019 meeting and the Termination Notice Meeting. Dr. Muster assured me I had done "nothing wrong," which is why I received a "No Cause Termination." He also stated that I was fired because "certain relationships were not fostered," and that the "consensus" of the neurosurgery group was to terminate my contract.

The Notice Letter also said that WMG was "waiving its right" to require me to work during my 180-day "No Cause" Notice Period, and that I no longer had any duties at WMG or "any WHS Hospital." This was in breach of Section 8.1 of my contract which states that they can "waive their right" to require me to work during the Notice Period, but does not allow them to affirmatively prohibit me from working during this time; Sections 7.3-7.6 also require them to provide me with office space, supplies, and staff, etc. for the duration of my Agreement. Dr. Muster knew that by prohibiting me from performing any duties after October 8, 2019, I could not finish the last 6 weeks of my Kennestone "mentorship" and therefore, could not complete WHS's Action Plan, which and that it would potentially ruin my career. Thus, this decision was yet another act of discrimination designed to harm me—if I had done "nothing wrong," I cannot fathom why else they would stop me from working during my Notice Period.

Incomplete Action Plan Used to Justify Refusal to Provide Clean Reference: As WMG/WHS knows, all neurosurgeon jobs are contingent upon WHS confirming my credentials and providing a "Letter in Good Standing," Shortly after my Termination Notice, however, WHS said they would not give me a clean reference for prospective employers. They claimed that I was not "in good standing" because I had an incomplete Action Plan at the time of termination.

At that point, I realized that WHS/WMG were not only terminating me from WMG, they were preventing me from obtaining employment anywhere else: (1) because the Termination Notice stopped me from working after October 8th, I could not complete my Action Plan; (2) because I could not complete my Action Plan, WHS Cobb refused to issue me a "Letter of Good Standing;" and (3) without WHS Cobb's "Letter of Good Standing," it would be nearly impossible to find a hospital that would credential me, rendering me unemployable as a neurosurgeon.[6] In effect, they

---

[6] Even applying for employment elsewhere is risky under these circumstances. For example, any

have bound me to a nationwide non-compete that never ends, which I understand would likely be ruled an "unlawful restraint on trade" under Georgia law if they had included it in my Agreement.

Notice Period Efforts to Complete Action Plan and Seek Alternate Employment: With no way to obtain new employment, and no way to complete my Action Plan *through WMG*, I attempted to find a way to complete my Action Plan directly with WHS Cobb, both by suggesting possible solutions, and asking them what they would find an acceptable substitute for my final six weeks at WHS Kennestone. I also asked, if we could not find an acceptable substitute, whether Cobb's MEC could rule that my Action Plan "complete," given my substantial and proactive completion of over 90% of my items. In my mind, this was the equivalent of the MEC "ending the Action Plan early," which they specifically told me that they could do during my August 2019 Check-In Meeting. Cobb's MEC rejected every idea presented and offered no reasonable solutions. Later, WMG's lawyer stated that it was wholly my fault that my Action Plan remained incomplete because I failed to work out a resolution with WHS, claiming, falsely, that I never offered any alternative solutions to WHS.

In truth, until the very last date of my Notice Period, I attempted to find a way that I could complete the Action Plan and get my Letter of Good Standing. In December 2019, I hired a law firm to assist me negotiate my separation by either: (1) finding an acceptable way for me to complete my Action Plan; or (2) agreeing to give me a clean employment reference based on my completion of all Action Plan items due before WMG notified me of my termination and banned me from working. I asked for no money or other special treatment, just a way out of this horrible situation that they placed me in because I am black.

Additionally, by March 2019, the COVID-19 Pandemic was national news, and I watched as Georgia hospitals struggled under the weight of the pandemic. At the time, I was still "employed" under my Notice Period and had insurance coverage and everything else needed to render me qualified to return for this purpose. I contacted WHS (copying Dr. Muster at WMG out of courtesy), to offer to return to WHS so that I could assist with their COVID-19 pandemic response and offered that this may also be a way to complete my Action Plan. Because I was still employed with WMG and this could have salvaged my future employability, and this was likely the final opportunity while I was still employed under my Notice Period to complete their Action Plan, I naively believed that my offer would be viewed by WHS as "win-win." Instead, WHS never responded. WMG's response, sent four days later, rejected my offer, and stated that I was never returning to WMG or WHS, ending any chance of me completing the remaining Action Plan items before my employment officially ended.

Dr. Muster also claimed in his response that WHS had adequate coverage for the pandemic. In truth, WHS was experiencing a shortage in essential medical personnel, and there is no rational justification for keeping me from working at WHS or at any other hospital in the country in the

---

hospital who denies my application based on information from WHS regarding my LOIs or incomplete Action Plan, could deem their denial as a "reportable event" triggering their reporting obligations to the Georgia Composite Medical Board and NPDB. If I was reported to either, it will take months (or longer) to untangle WHS's baseless Action Plan and the underlying LOIs, and being "reported" will make it exponentially harder for me to future jobs or hospital privileges.

midst of a crisis the likes of which we have never seen. [7] It was morally and ethically wrong to preclude me from practicing medicine during this global pandemic, particularly given recent, highly publicized healthcare worker shortages, my fellowship training, specialization, on-the-job track record, and the fact that I belong to a key demographic (under 50, not immune-compromised).

**Retaliation**: At each point when I complained about Dr. Benedict and/or WMG/WHS's discriminatory treatment, I suffered retaliation:

- Between May 2019 and June 2019, when I first began expressing concerns about Dr. Benedict's continued targeting of me, rather than investigating these concerns, or looking into the inordinate number of "LOIs" being filed against me, Dr. Muster attempted to constructively discharge me by repeatedly suggesting that I resign. (See Supplemental Facts)

- Two months after I complained to WHS Cobb's MEC about Dr. Benedict (August 2019 Meeting), Dr. Muster terminated my WMG employment and refused to allow me to return to work during my six-month Notice Period so that I could complete my Action Plan.

- In January and February 2020, my lawyers reported, verbally and in writing, my concerns that WMG/WHS's actions were based on my race and national origin and/or in retaliation for complaining about Dr. Benedict as they attempted to negotiate my exit in advance of the end of my 6-month Notice Period. A few weeks later, when I volunteered to return to WHS to assist with the COVID-19 pandemic response, Dr. Muster intervened to reject my offer on behalf of WMG and WHS, interfering with WHS Cobb's ability to independently respond or accept my offer, which included a potential solution to the Action Plan issue, and stated that I was prohibited from directly emailing Dr. Hughes or anyone on Cobb's MEC. (Attachment 3). In fact, he stated that he would "notify" Jody Hughes of his decision, clear evidence that WMG stripped WHS's authority to independently accept or reject my offer.

With respect to the final incident, before this email, I believed that WMG had no input into the Action Plan issue. In fact, Dr. Muster and WMG's lawyer had previously stated that: (1) the Action Plan was "out of [Dr. Muster and/or WMG's] hands"; (2) the decision to modify the Action Plan, bring me back, or to deem that the Plan was sufficiently completed was WHS's alone; (3) WMG had no involvement or input into those decisions; and (4) WMG's termination—despite being for "no cause"—left them with no power to modify the Action Plan in any way.

Muster's final statement, that my email was not well-received because of the "reminder of pending litigation," is direct evidence that Dr. Muster's rejection of my offer to help while also allowing me to complete the Action Plan was retaliatory. A few weeks separated my lawyers' correspondence reiterating my concerns about animus based on my race and national origin guiding WMG's decisions (led by Dr. Muster) and Dr. Muster's email rejecting my offer. This

---

[7] Dr. Muster's statement regarding "coverage" was simply not true. At the time I offered to volunteer, WHS had 13 job postings for neurology-related positions, including a PRN position, on its job website www.careers.wellstar.org. The shortages in qualified medical personnel are so severe that several states are allowing medical students to treat patients. In fact, I had heard that WHS Cobb's MEC was planning to loosen the credentials criteria in order to hire more medical professionals to help deal with influx of patients at Cobb Hospital.

response is an adverse employment action because it prevents WHS from bringing me back to work and prevents me from completing my Action Plan, all because I referenced potential litigation based on reported discriminatory acts.

**WMG/WHS Continue to Engage in Discrimination, Retaliation, And Pretext:** Once they were contacted by my lawyers, WMG started to come up with new explanations for Dr. Benedict's and Dr. Muster's discriminatory actions, all of which are pretext:

- WMG first insinuated that my termination has been related to my Action Plan and the LOIs leading up to it. If true, and they had terminated me "for cause," I would have had due process rights to appeal both the termination and underlying findings. Thus, by choosing "No Cause" they were also intentionally depriving me of the ability to challenge the decisions that have led me to being unable to get a letter in good standing. Under a "No Cause" termination, I have no such rights.

- WMG's lawyer then claimed that my employment termination was based not due to the Action Plan, but rather, the following two issues (but, as stated by him, primarily the first issue): (i) an August 2019 patient-related incident (the same one I shared during my August Action Plan meeting and warned them that Dr. Benedict was unfairly trying to claim I mishandled); and (ii) Dr. Benedict's subjective opinion that I "was not getting it" or had not progressed far enough on (unspecified) non-clinical metrics sufficient to ease his (unspecified) concerns regarding my medical judgment and ability to "fit in." My lawyers provided concrete evidence that Dr. Benedict had falsely characterized the August 2019 patient incident, and in fact, wanted so badly to prove that I had missed something that he recommended this elderly patient undergo what I viewed to be a medically-unnecessary surgery—but when they operated, nothing was found and the surgeon who performed the procedure at Dr. Benedict's request told me that he regretted agreeing to do it. WMG's lawyer had no real response to this evidence other than to say there were "other reasons" than the two that he had previously identified as "the" two reasons I was terminated.

- One additional explanation he gave was they could not let me return because my "complications rate" was "much higher" than WMG's average rate for neurosurgeons, rendering me unfit to be a part of that group. In response, my lawyer told WMG's lawyer that we actually believe that my incident rate was much lower than the national average, and asked them to provide my rate, as well as the national average for neurosurgery, and the complications/incident rate for WMG's Neurology Group as a whole. WMG refused.

- Last, WMG claimed that they would not and could not allow me to return to work because Cobb MEC's had lost trust in my medical judgment, and there were concerns that I "posed a threat to patient safety." (Attachment 4).

All of these explanations were <u>only</u> offered after my lawyers repeatedly pressed them for an explanation for their refusal to allow me to return to work during my 6-month Termination Notice Period. **Yet, throughout their discussions with my lawyers, <u>WMG was not able to cite to a single incident</u> where my skillset and medical judgment presented a threat to patient safety.**

These new explanation for my termination and their refusal to allow me to complete the Action Plan continue to pose a direct threat to my medical career and livelihood. They are now painting me as a neurosurgeon who poses a threat to patient safety—when nothing in my record substantiates such characterization. WMG continues to make these types of disparaging comments

without any proof, even though there is nothing in the LOIs cited to justify my Action Plan that indicate any "quality of care" issues, and there were no other incidents that justify claiming that the real reason for banning me from working after October 8, 2019 was "patient safety." These explanations also directly contradict Dr. Muster's recorded statements during my Termination Notice Meeting, where he assured me that I had done "nothing wrong," and that the decision to terminate, was performance-based, nor based solely on Dr. Benedict's opinion, but instead it was the "group's consensus" based on personality clashes. [8]

Failure to Investigate or Take Corrective Action: As stated above, other than placing me on an Action Plan to try to minimize Dr. Benedict's targeting and attempting to convince me to resign, WMG/WHS did nothing to address the concerns expressed throughout my employment.

Even when my lawyers contacted WellStar's legal department, their lawyer adamantly denied any wrongdoing, and offered increasingly complicated and contradictory explanations. In fact, instead of conducting any investigation into the evidence provided WellStar's lawyer, he defended the Drs. Muster and Benedict, even after my lawyers gave him specific evidence disproving their explanations.[9] Assuming there was no discriminatory intent behind their actions, you would think that WellStar's lawyer would try to help find a resolution rather than allowing me to remain unemployable once alerted of everything. Instead, he refused every option presented by my lawyers and offered no viable alternative solutions.

In sum, the LOIs leading to the Action Plan; Action Plan itself; notice of termination; and refusal to allow me to return during the notice period to complete the Action Plan; and the refusal to issue me a Letter in Good Standing for failing to complete the Action Plan are all discriminatory and illegal acts that are ruining my career and giving WHS/WMG a nationwide non-compete, which prevent me from future employment elsewhere until this is resolved. WMG/WHS's wrongful conduct has resulted in financial harm and has damaged my reputation in the medical community in Georgia, and nationally. Their actions have also caused me mental and physical distress resulting from my inability to work, including being unable to even volunteer to help during the COVID-19 pandemic (which I view as part of my duties as a physician to my community), the stress of not having income to support my family, and the damage this whole ordeal has caused to my professional reputation.

---

[8] These statements about "consensus" have been firmly contradicted by several WMG neurosurgeons, all of whom say they never knew of, or approved my termination., and deny expressing any concerns about my skills or judgment to Benedict or Muster. One characterized my firing as a "calculated hit" and "assassination" and several offered to write letters of reference, two of which I already have (and both contradict false narrative about my skills, judgment, and "patient safety"). (See Attachment 5).

[9] When my lawyers first requested that WMG's legal department investigate my complaints about Dr. Muster, Dr. Benedict, and the issues surrounding my "Letter in Good Standing," WMG's counsel suggested a call with Dr. Muster to discuss their findings. When my lawyer's pointed out the conflict created by having one of the accused assist with their investigation, WMG's lawyer responded that he has worked with Dr. Muster for the past 20 years and that "they have a type of relationship that if he asks Dr. Muster to rearrange his schedule, he will do it." This showed me that WMG's legal department is incapable of conducting an impartial investigation.

There is no credible explanation for the discriminatory actions taken by Dr. Benedict and Mr. Muster and WMG's continued refusal to investigate or take action against the people who discriminated and retaliated against me shows that these actions were ratified by the highest levels of management at WMG and WHS, which have resulted in ending my career. There is very little that someone could say that would affect me more mentally or emotionally than the things they have said about me. To take away my livelihood on top of that is almost too much to bear.

I believe that I have been discriminated against because of my race and national origin (African-American and Nigerian) and subjected to retaliation for complaining about same in the form of termination, making defamatory statements about my surgical abilities and judgment, and refusing to issue me a "Letter in Good Standing" or allow me to complete my Action Plan, all in violation of Title VII. I also believe that their actions against me are a part of a larger pattern and practice of discrimination and retaliation against African-American physicians.

**ATTACHMENT 1**

# PHYSICIAN SERVICES AGREEMENT

**THIS PHYSICIAN SERVICES AGREEMENT** ("Agreement") is made this _____ day of _____, 2017, by and between **WELLSTAR HEALTH SYSTEM, INC.,** a Georgia nonprofit corporation ("WellStar"), **WELLSTAR MEDICAL GROUP, LLC,** a Georgia limited liability company (the "Medical Group"), and **DARE A. ADEWUMI, M.D.,** a licensed physician ("Physician").

# W I T N E S S E T H :

**WHEREAS,** the Medical Group manages and operates a tax-exempt medical care group providing physician services in Georgia for the benefit of the community;

**WHEREAS,** WellStar, through its subsidiaries, operates and manages acute care hospitals located, as of the date hereof, in metropolitan Atlanta and other various locations in Georgia (collectively, including any other hospital subsequently operated by WellStar or a subsidiary, the "System Hospitals" or the "Hospitals", and the System Hospitals, together with the Medical Group, hereinafter the "System" or the "WellStar Health System");

**WHEREAS,** Physician is legally authorized, or will be by the Commencement Date, to practice medicine within the State of Georgia and specializes in neurosurgical medicine;

**WHEREAS,** the Medical Group desires to employ Physician to provide medical services for the Medical Group as part of its integrated health care delivery system; and

**WHEREAS,** Physician desires to accept such employment with the Medical Group upon the terms and conditions set forth herein;

**NOW, THEREFORE,** for and in consideration of the premises and the mutual covenants and agreements herein set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

## Section 1.    Engagement.

Subject to the terms hereof, the Medical Group hereby employs Physician to render medical services on its behalf on and after the Commencement Date (as hereinafter defined), and Physician hereby accepts such employment.

## Section 2.    Term.

Subject to Sections 5 and 15.16, the initial term of this Agreement shall be for a period of two (2) years (the "Initial Term") commencing on March 19, 2018 (the "Commencement Date") and (unless terminated sooner pursuant to the provisions of Section 8 hereof) ending on the second anniversary of the Commencement Date.   Thereafter, this Agreement shall be automatically renewed without action by either party for successive one-year periods, unless

sooner terminated pursuant to the provisions of Section 8 hereof.  For all purposes of this Agreement, "term" shall include both the Initial Term of this Agreement and any successive term.

### Section 3.    Parties Duties and Responsibilities.

**3.1    Physician Position and Duties**:  During the term of this Agreement, Physician shall provide professional medical services on behalf of the Medical Group and such other services as specified in this Section 3.  Physician agrees (a) to devote his full business time and to use his best efforts in the performance of his duties as a physician of the Medical Group ("full business time" for purposes hereof shall mean, at a minimum, regular office hours, Monday through Friday, with one afternoon off per week), with such schedule to be specified by the Medical Group, (b) to provide services at office locations approved by the Medical Group, (c) to participate in managed care arrangements entered into by the Medical Group, the System, and its Affiliates, (d) to cooperate with, participate in, and comply with, the quality assurance, risk management and peer review programs, grievance procedures and utilization control mechanisms implemented by the Medical Group and its Affiliates, (e) to participate in the Medicare and Medicaid programs and to provide nondiscriminatory medical treatment for Medicare and Medicaid patients, (f) to actively support the health care mission, goals and objectives of the Medical Group and to facilitate the ongoing integration of the activities of the System, (g) to participate in administrative, clinical and strategic planning activities of the System and the Medical Group, including departmental and committee activities whose purposes shall be the improvement of the clinical quality of care of the Medical Group and the System, (h) to engage in research and education activities as requested by the Medical Group and System to further their charitable, educational and scientific missions, (i) to provide medical care in a nondiscriminatory manner to charity and indigent patients of the Medical Group and the System in accordance with the policies and guidelines established by the Medical Group and the System, and (j) to perform such other duties relating to the provision of medical services as may be assigned to him from time to time by the President, WellStar Medical Group or his/her designee.

**3.2    On-Call Scheduling.**  The Medical Group shall develop an on-call schedule for Physician's specified office practice with Physician's on-call obligation to be determined at a participation level generally assumed by the other physicians in such office location(s).  During the term of this Agreement, Physician shall also participate in rotational on-call and emergency department coverage at the System Hospitals, in accordance with the applicable Hospital's Medical Staff Bylaws, Rules & Regulations.

**3.3    Medical Staff Membership.**  Physician shall, throughout the term of this Agreement, maintain active membership on the Medical Staff of the System Hospitals designated by the Medical Group.  Physician may be required to provide reasonable participation in medical staff leadership or administrative positions within the System.

**3.4    Outside Employment.**  The parties agree that, during the term of this Agreement, Physician shall practice medicine solely as a full-time employee of the Medical Group and shall not, either directly or indirectly, undertake a service for the benefit of any other person or entity, unless prior written approval is obtained from the Medical Group, which approval may be withheld in the Medical Group's sole discretion.  Nothing herein shall be construed to prevent Physician from entering into independent agreements concerning consulting arrangements, speeches, seminars, publishing endeavors or the development of devices or technologies (with

such publishing endeavors or device or technology development subject, however, to Section 15.17 of this Agreement), and other professional activities, so long as they are approved in advance in writing by the Medical Group, which approval shall not be unreasonably withheld, and so long as participation in such activities does not interfere with Physician's ability to meet his obligations as set forth in this Agreement or conflict with the mission or policies of the Medical Group. Income derived from all such outside activities authorized by the Medical Group will be the property of Physician.

**Section 4.     Professional Income.**

All charges and income derived from professional medical activities accepted or undertaken by Physician on behalf of the Medical Group during the term of this Agreement shall be for the benefit of the Medical Group, and Physician hereby assigns such charges and income to the Medical Group. Charges, fee schedules, and coding for professional services rendered to patients by Physician shall be established by the Medical Group. Further, Physician agrees and understands that charges to participants for supplies, drugs, laboratory services and other non-professional components of the services provided by Physician or the Medical Group shall be established by the Medical Group. Physician shall record, daily and accurately, professional services rendered by Physician and the charges therefor on forms provided by the Medical Group. The Medical Group shall be responsible for all billing and collection activities relating to professional services performed by Physician pursuant to this Agreement. Physician hereby adopts and affirms the provisions of Exhibit A hereto, a copy of which is attached hereto and incorporated herein by this reference.

**Section 5.     Physician's Representations and Warranties.**

Physician represents and warrants to the Medical Group that Physician is, or will be by the Commencement Date, duly licensed to practice medicine in the State of Georgia and duly licensed in the State of Georgia to dispense drugs and controlled substances. Physician further represents and warrants to the Medical Group that (i) Physician's license to practice medicine in any state (and Physician's permit to dispense or prescribe drugs and other controlled substances) has never been suspended, restricted or revoked; (ii) Physician has never been reprimanded, sanctioned or disciplined by any governmental entity, licensing board or state or local medical society or specialty board; (iii) Physician has never been denied membership or reappointment of membership on the medical staff of any hospital, that no hospital medical staff membership or clinical privileges of Physician have ever been suspended, curtailed or revoked, and that Physician has never voluntarily withdrawn an application for appointment or reappointment to the medical staff of any hospital; (iv) all information provided in the employment application which the Physician has submitted to the Medical Group or information contained in any application for clinical privileges at a Hospital is, or will be, true and correct; and (v) Physician has never been convicted of or pled guilty to, including, but not limited to, a plea of nolo contendere, a crime except for minor traffic offenses. Physician also represents and warrants to the Medical Group that (i) Physician shall maintain Physician's license to practice medicine in the State of Georgia and Physician's permit to dispense or prescribe drugs and other controlled substances in the State of Georgia during the term of this Agreement; and (ii) if the Medical Group requested Physician to obtain membership on the medical staff of a hospital, Physician shall maintain such active membership on such medical staff during the term of this Agreement and such medical staff membership shall not be suspended, curtailed or revoked. The foregoing

shall not include medical record suspensions and similar administrative suspensions resolved in ten (10) days.

Physician additionally represents and warrants that he has disclosed to the Medical Group any restrictive covenant agreement entered into with a prior employer which is still in effect and that his employment with the Medical Group does not violate any such prior restrictive covenant agreement. Furthermore, Physician understands and the Medical Group expressly states that the Medical Group desires to hire Physician for his general professional expertise and knowledge and not to obtain the confidential information or trade secrets of any prior employer.

### Section 6.    Performance Standards.

**6.1**    In performing services under this Agreement, Physician shall (i) use diligent efforts and professional skills and judgment; (ii) perform professional services in accordance with recognized standards of the medical profession; (iii) act in a manner consistent with the Principles of Medical Ethics of the American Medical Association; (iv) be subject to, and comply with, the Bylaws, written policies, rules and regulations of the Medical Group and WellStar, and the Medical Staff Bylaws, policies, rules and regulations of a System Hospital; (v) be subject to, and comply with, the Medical Group's Professionalism Code; (vi) comply with applicable standards of The Joint Commission; and (vii) comply with all applicable federal, state and local laws and regulations including, but not limited to, the Health Insurance Portability and Accountability Act of 1996, as amended by the Federal Health Information Technology for Economic and Clinical Health Act and its implementing regulations ("HIPAA"). Notwithstanding the above, it is agreed that the Medical Group shall exercise no control over the professional actions and medical techniques of Physician in his practice of medicine for the Medical Group.

**6.2**    Periodically, in the discretion of the Medical Group, the Medical Group shall evaluate and assess the Physician's performance of services hereunder in accordance with any review policies the Medical Group and WellStar may have in effect from time to time.

**6.3**    In order to promote the delivery of efficient, cost-effective and quality care for patients of the integrated healthcare delivery system managed by WellStar Health System, Physician shall use his/her best efforts to utilize healthcare services (including ancillary services) available from WellStar Health System or its affiliates except when (i) the use of a different provider is required by the terms of a patient's enrollment or participation in an insurance or other health care plan, (ii) Physician determines that the use of WellStar Health System or its affiliated providers to provide such services is not in the best medical interests of the patient, (iii) the patient on his/her own initiative requests to use a different provider, (iv) WellStar Health System or its affiliated providers do not offer the needed services, or (v) such services are necessary in a medical emergency. Nothing in this Section 6.3 is to be construed to restrict Physician's professional judgment while performing professional services under this Agreement to refer any patient to any health care facility where necessary or desirable in order for a patient to obtain proper and appropriate treatment or to comply with the wishes of the patient or patient's family.

**Section 7.    Compensation.**

**7.1    Compensation.**  During the term of this Agreement, Physician shall be paid in consideration of the services provided under this Agreement, the compensation set forth on Exhibit B attached hereto.  Notwithstanding the terms of Exhibit B, Physician's compensation shall at all times be consistent with the principles under which the Medical Group and System must conduct its financial affairs, including, without limitation, the rules and regulations of the Internal Revenue Service that are applicable to tax-exempt organizations.  Physician's level of compensation must, therefore, be established at a level that is fair market value and reasonable for the services that Physician renders to the Medical Group, System and its patients.  The determination of what is fair market value and reasonable may change from time to time and is based upon a number of factors including (i) the level of compensation received by other physicians in the community with similar specialties, experience and education, (ii) Physician's special training and expertise, if any, (iii) the hours and effort committed by Physician to Medical Group and System, (iv) the administrative and charity services provided by Physician to the Medical Group and System, (v) the quality of care provided by Physician, and (vi) Physician's cost-effective use of the Medical Group's resources.

**7.2    Vacation, Sick Leave, and CME Days.**  During the term of this Agreement, Physician shall be entitled to the following time off: (a) a total of three (3) work weeks each year for vacation and sick leave; (b) one (1) work week each year for CME; (c) participate in the Medical Group's Extended Illness Bank Program in accordance with Medical Group policy as amended from time to time; and (d) such holidays as specified in the Medical Group policy as amended from time to time which shall be taken in accordance with such policy; subject, however, to Physician's on-call obligations.  For purposes of this Agreement, a work week shall include the number of days normally worked by the Physician during any week.  Additionally, the Medical Group will reimburse Physician for approved expenses in an amount up to $3,000.00 per year for documented attendance at CME meetings in accordance with the Medical Group's policy, as amended from time to time.  Vacation, sick leave, and CME days shall be accrued and used in accordance with Medical Group or WellStar policies as amended from time to time.

**7.3    Office Space.**  During the term of this Agreement, the Medical Group shall provide Physician with professional office space at no cost to Physician, which Physician may use for the performance of his duties hereunder.  The Medical Group will consider the input of the physicians currently practicing at such office location should the Medical Group desire to assign an additional physician to such office location.

**7.4    Equipment and Supplies.**  During the term of this Agreement, the Medical Group shall provide expendable and non-expendable medical equipment, drugs, supplies, furniture, and fixtures which the Medical Group determines, in its sole discretion, to be necessary for the proper operation and conduct of the Medical Group.  The Medical Group shall bill exclusively for all supplies issued as patient charges.

**7.5    Utilities and Support Services.**  The Medical Group shall provide all utilities, housekeeping and other non-medical support services as may be required, in the discretion of the Medical Group, for the proper operation and conduct of the Medical Group.

**7.6    Personnel.** All non-medical and medical personnel determined, in the Medical Group's discretion, to be necessary for the proper operation of the Medical Group shall be employed or engaged as independent contractors by the Medical Group. All hiring and dismissal decisions concerning such medical and non-medical employees or independent contractors shall rest with the Medical Group.

**7.7    Malpractice Insurance.** During the term of this Agreement, the Medical Group and/or WellStar shall maintain, at its expense, professional malpractice liability insurance covering Physician for services rendered on behalf of the Medical Group or WellStar pursuant to this Agreement, in an amount not less than $1,000,000.00 per claim, $3,000,000.00 in the aggregate (the "Insurance Limits").   The professional malpractice insurance provided to Physician by this Section 7.7 is an "occurrence based" policy and therefore, the Medical Group or WellStar shall continue to provide such coverage after the termination of this Agreement for the acts or omissions of Physician which occur during the term of this Agreement in an amount up to the Insurance Limits.

**7.8    Other Benefits.** The Medical Group and/or WellStar shall provide Physician with a cell phone allowance in accordance with Medical Group policy and such employee benefits, such as health insurance (covering Physician and his family), dental insurance, life insurance, and disability insurance which are normally offered to other employees of the Medical Group in accordance with the terms in effect from time to time. Additionally, during the term, the Medical Group shall pay (i) Physician's Board Certification/Re-Certification Examination Fee, as the case may be, incurred during the term of this Agreement; (ii) the usual and customary fees required for Physician to obtain a Georgia Medical License, a DEA License, and a County or City Business License (as applicable), incurred during the term of this Agreement; and (iii) other usual and customary professional dues, journals and subscription fees, as mutually agreed to by the parties, in an amount not to exceed $750.00 per year. The foregoing expenses and fees shall be paid in accordance with the "Other Benefits Reimbursement Policy" in effect from time to time.

**7.9    Taxes.** The Medical Group and/or WellStar shall file W-2 forms with respect to Physician's income under this Agreement and shall withhold all amounts required by law to be withheld from the compensation paid to Physician hereunder including, without limitation, withholding for FICA taxes.

**Section 8.    Termination.**

**8.1    Termination Without Cause.** Either party may, without cause, terminate this Agreement upon one hundred eighty (180) days written notice to the other party; provided, however, that the noncompetition covenant set forth in Section 13 shall not be enforceable if this Agreement is terminated without cause by the Medical Group.   The Medical Group and Physician hereby acknowledge and agree that in the event of termination of this Agreement pursuant to Section 8.1 within twelve (12) months from the Commencement Date, the Physician shall not become employed by the Medical Group for the remainder of such one (1) year period, except on terms substantially similar to the terms as expressed in this Agreement. The parties also understand and acknowledge that, in the event of the termination of this Agreement pursuant to this Section 8.1, the Medical Group may elect to waive its right to require Physician to continue to render services hereunder during the one hundred eighty (180) day notice period.

Physician shall continue to be compensated for a period equal to the earlier of (i) the expiration of such one hundred eighty (180) day period, or (ii) the date Physician accepts employment with another employer.

    **8.2**    **Automatic Termination.**  This Agreement shall automatically terminate upon the death of Physician.  Additionally, the Medical Group shall have the right to terminate this Agreement immediately, with cause, upon written notice to Physician if:

        (i)    Physician's license to practice medicine (or permit or license to dispense or prescribe drugs or controlled substances) in Georgia shall have been revoked, suspended or restricted; or

        (ii)    Physician fails to become credentialed in accordance with the Medical Group policy; or

        (iii)    Physician's right to participate in the Medicare and Medicaid programs shall have been revoked, suspended or restricted; or

        (iv)    Physician is found to have engaged in unprofessional conduct by any governmental entity or professional organization; or

        (v)    Physician breaches a representation, warranty or covenant contained in this Agreement; or

        (vi)    Physician makes a material misrepresentation or omission of information in an application for employment or staff privileges with any hospital, physician hospital organization, or any other health care provider; or

        (vii)    Physician has been adjudicated or pled guilty (by a plea of nolo contendere or otherwise) of criminal charges filed against him; provided, however, Physician may, at the discretion of the Medical Group, be suspended from his duties hereunder, so long as such criminal charges are pending; provided, further, such suspension will be with or without pay, at the discretion of the Medical Group, depending upon the circumstances; or

        (viii)    Physician shall commit an act or omit to take an act that in the good faith and reasonable belief of the Medical Group, as determined by the President, WellStar Medical Group, jeopardized, or could have jeopardized, patient health or safety; or

        (ix)    Physician becomes ineligible for medical liability insurance coverage upon the same terms and conditions as other physicians engaged by the Medical Group; or

        (x)    Physician's medical staff membership at a hospital within the System is suspended, terminated or restricted.  The foregoing shall not include medical record suspensions and similar administrative suspensions resolved in ten (10) days; or

        (xi)    Physician engages in conduct which is considered by the Medical Group

in its sole discretion to be unethical, unprofessional, fraudulent, unlawful or adverse to the interest, reputation or business of WellStar, the Medical Group or the System, or any of their respective officers or members of the Board of Trustees, including, but not limited to, conduct which would be deemed by a reasonable person to be disruptive, intimidating, coercive or harassing.

**8.3    Termination for Disability.**  In the event Physician becomes disabled, as defined by the Medical Group's disability policy, Physician's employment and the Medical Group's right to terminate this Agreement, shall be in accordance with the Medical Group's policy, as amended from time to time.

**8.4    Termination for Breach.**  This Agreement may be terminated immediately by either party upon written notice if the other party hereto shall have materially breached this Agreement; provided, however, if the material breach or breaches are curable, the non-breaching party must first provide written notice to the breaching party of the material breach(es) and specify the nature of the breach, and request that it be cured within thirty (30) days of the date of the notice. If such breach(es) are not thereafter cured within such thirty (30) day period, the non-breaching party may then terminate this Agreement on written notice.

**Section 9.    Assignment.**

Physician recognizes that the duties to be performed by him are personal in nature and are to be performed by him personally. Accordingly, Physician agrees that he may not assign this Agreement in whole or in part to any other person or entity, by operation of law or otherwise, without the prior written consent of the Medical Group, which consent may be withheld in the Medical Group's sole discretion. Any attempted assignment by Physician without the Medical Group's prior written consent shall be null and void.

**Section 10.    Compliance with the Medical Group Rules and Regulations.**

In fulfilling his duties hereunder, Physician shall, in every respect, be subject to and comply with the policies and procedures of WellStar and the Medical Group adopted from time to time. During the term of this Agreement and upon termination hereof for any reason, all patient records, including, but not limited to, x-rays and charts, of any patient attended by Physician shall be and remain the property of the Medical Group. Physician shall maintain all patient records in accordance with all applicable laws and regulations pertaining to the confidentiality thereof.

**Section 11.    Renegotiation.**

If the Medical Group's legal counsel determines that payments or reimbursements to the Medical Group or Physician, or the ability of the parties hereto to fulfill their obligations hereunder, or the tax-exempt status of the Medical Group or System are (or are likely to be) adversely impacted by any federal, state or local law, rules, regulations, or published official interpretation of any of the foregoing, as applied to this Agreement, then, at the option of the Medical Group, the parties shall negotiate in good faith to amend this Agreement in a manner which will, if possible, avoid such adverse impact while maintaining the essential economic benefits intended to be conferred hereby. If this Agreement is not so amended prior to the

effective date of such requirement or within thirty (30) days after the Medical Group's notice to negotiate under this Section, whichever shall first occur, then this Agreement shall terminate, at the option of the Medical Group, as of such date.

**Section 12.    Access to Records.**

Until the expiration of four (4) years after the furnishing of services hereunder, Physician shall make available, upon written request, to the Secretary of Health and Human Services, or, upon written request, to the Comptroller General of the United States, or any of their duly authorized representatives, this Agreement, including all amendments hereto, and books, documents and records of Physician that are necessary to certify the nature and extent of costs for services provided hereunder.

**Section 13.    Covenants of Physician.**

**13.1    Noncompetition and Nonsolicitation Covenants.**    During the term of this Agreement and for one (1) year after termination of this Agreement for any reason (except if termination of this Agreement is by the Medical Group pursuant to Sections 8.1 or 11 hereof or by Physician pursuant to Section 8.4 hereof), Physician will not, directly or indirectly (i) solicit "Patients" of the Medical Group, as defined below, for the purposes of providing professional neurosurgical medicine services to such Patients, or (ii) seek to induce employees or Patients to terminate their employment or patient relationship, as the case may be, with the Medical Group or System, or to violate any agreement with the Medical Group or System (provided, however, that this prohibition shall not restrict Physician's ability, during the term of this Agreement, to refer patients to such providers as are determined necessary in Physician's medical judgment); or (iii) maintain an office, or office hours, or otherwise provide neurosurgery medical services in the "Territory," including, without limitation, the provision of neurosurgery medical services in a hospital, hospital-based facility, or other healthcare facility in the Territory; provided, however, that services performed by Physician pursuant to this Agreement shall not be deemed in violation of this Section. For purposes hereof, the "Territory" shall mean the geographical areas within a circle having as its center 3950 Austell Road, Austell, GA 30106, and having a radius of fifteen (15) miles from such center and "Patients" shall mean patients Physician has provided professional medical services to within twenty-four (24) months prior to the termination of this Agreement.

**13.2    Proprietary Information and Products; Protected Health Information.**

(a)    Proprietary Information and Products.    Physician shall at all times hold in strictest confidence, and will not without the Medical Group's prior written consent, use any copyrighted, proprietary, secret or confidential information or products of the Medical Group or the System (the "Proprietary Information and Products") except in fulfillment of Physician's duties hereunder. Such Proprietary Information and Products shall include, but not be limited to, symbols, trademarks, service marks, designs, management information systems, utilization procedures and protocols, forms and claims processing techniques, utilization review and quality assurance mechanisms and data, agreements with managed care organizations and purchasers of services, educational programs related to System's and the Medical Group activities, any information related to the System's or WellStar's financial affairs, business and marketing plans and strategies, contract negotiations with managed care organizations, the Medical Group or

System fee schedules, Protected Health Information, patient information pertaining to third party payors or employers or other payors, patient charts, lists or records, clinical procedures, methods of operation, policies, procedures and current business opportunities and any other information, knowledge and know-how that System or the Medical Group considers to be a trade secret or confidential information. Physician agrees that during the term hereof and thereafter he will keep such Proprietary Information and Products confidential and shall not disclose any such Proprietary Information and Products to the extent not generally known to the public, to any third party or entity. At all times, the Proprietary Information and Products shall be the property of System or the Medical Group, as the case may be. Physician shall cease any and all use of the Proprietary Information and Products and shall return any Proprietary Information and Products in Physician's possession to the Medical Group immediately upon termination of this Agreement. Proprietary Information and Products does not include: (i) information which the Physician had in his possession prior to receiving it from the Medical Group or System; (ii) information which the Physician properly receives from a third party; (iii) information which the Physician independently develops without reference to information received from the Medical Group or an Affiliate; (iv) information publicly available; or (v) information disclosed pursuant to a validly-issued court order, investigative process, subpoena or other legal process, or otherwise required to be disclosed under applicable law.

(b)     Protected Health Information.  Notwithstanding any provision herein to the contrary, Physician agrees to maintain and protect the privacy, confidentiality and security of Protected Health Information during the term of this Agreement and thereafter in accordance with all applicable laws and regulations pertaining thereto, including, but not limited to, HIPAA. At all times, the Protected Health Information shall be the property of the patient and the Medical Group/System. Physician shall cease any and all use of the Protected Health Information and shall return any Protected Health Information in his possession to the Medical Group immediately upon termination of his engagement with the Medical Group or upon termination of this Agreement. Physician acknowledges that compliance with this Section is necessary under state, federal and local laws and regulations, as well as for the protection of the goodwill and other proprietary interests of the Medical Group/System.

(i)     For purposes of this Agreement, "Protected Health Information" shall mean Individually Identifiable Health Information that is transmitted by electronic media, maintained in any form of electronic media, or transmitted or maintained in any other form or medium.

(ii)     For purposes of this Agreement, "Individually Identifiable Health Information" shall mean any information collected from an individual and held by the Medical Group/System including elements that allow unique identification of an individual, such elements include without limitation, specific demographic information such as name, address, social security number, date of birth, and sex that: (a) is created or received by the Medical Group/System; and (b) relates to the past, present, or future physical or mental condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to the individual and identifies the individual or provides a reasonable basis to believe the information can be used to identify the individual. By way of example and not in limitation of the foregoing, Individually Identifiable Health Information includes: (a) patient information generated, collected, maintained, transmitted or distributed by the

Medical Group/System including transferred medical records, x-rays, charts and all correspondence; (b) information entrusted by a patient or research subject to a Physician; (c) any knowledge the Medical Group/System has regarding a patient; or (d) research information collected, generated, maintained or disseminated by the Medical Group/System which identifies an individual or when combined with other data can lead to the identification of an individual.

**13.3    Term.**  The Physician's obligation to maintain confidentiality of all Proprietary Information and Products which constitute trade secrets as defined in the Georgia Trade Secrets Act of 1990 ("Trade Secrets") and Protected Health Information shall survive the termination or expiration of the Agreement as set forth in the applicable law.  The Physician shall maintain the confidentiality of the Proprietary Information and Products which does not rise to the level of Trade Secrets or Protected Health Information for a period of three (3) years following the termination or expiration of this Agreement.

**13.4    Remedies.**  Physician agrees that the covenants and agreements contained in this Section shall be construed as agreements independent of any other provisions of this Agreement and that ascertainment of damages in the event of a breach of this Section 13 would be difficult, if not impossible; and, therefore, Physician hereby agrees that the Medical Group/WellStar, in addition to and without limiting any other remedy it may have, shall have the right to an injunction issued by a court of competent jurisdiction enjoining any such breach, and Physician hereby waives (i) any defense he may have that the Medical Group/WellStar has or will then have an adequate remedy at law with respect to any such breach, and (ii) any right to require the Medical Group/WellStar to post a bond to enforce this Section 13.

**Section 14.    Indemnification.**

WellStar and the Medical Group agrees to indemnify, defend and hold Physician harmless from and against any and all liability, loss, claim or expenses (including reasonable attorneys' fees) arising from or in connection with any acts or omissions of Physician pertaining to his services rendered pursuant to this Agreement; provided, however, this indemnification provision shall not apply to any liability, loss, claim or expenses arising from or in connection with Physician's gross negligence or intentional misconduct.

In the event any third person or entity asserts any claim or action against Physician which might result in a claim for indemnity hereunder, Physician shall immediately notify the Medical Group, in writing, of such claim or action, and at the Medical Group's option, may, at its sole expense, assume control over the defense of such claim or action, and may compromise or settle such claim or action at the discretion of WellStar or the Medical Group.

**Section 15.    Miscellaneous.**

**15.1    Successors.**  All the provisions herein contained shall be binding upon and inure to the benefit of the respective heirs, personal representatives, successors and assigns of the Medical Group, WellStar and of Physician; provided, however, that nothing contained in this Section 15.1 shall be construed as a consent by the Medical Group to an assignment of this Agreement or of any interest herein by Physician except as provided in Section 9 above.

**15.2   Other Employment Arrangements.**  As noted in Section 3.4 hereof, Physician may enter into other employment arrangements for profit with third parties upon disclosure of the arrangement to the Medical Group and receipt of the prior written approval of each arrangement by the Medical Group.  The Medical Group, at its option, may require Physician to obtain and maintain professional malpractice liability insurance as a condition for the Medical Group's approval of such third party arrangement.

**15.3   Headings.**  The headings to the various sections of this Agreement have been inserted for convenience of reference only and shall not modify, define, limit or expand the express provisions of this Agreement.

**15.4   Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be an original, and each of such counterparts shall together constitute but one and the same agreement.

**15.5   Notices.**  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been received by the person to whom it is addressed when delivered if delivered in person or three (3) days after it is deposited in the United States mail, if mailed by certified or registered mail, postage prepaid and addressed as follows:

|  |  |
|---|---|
| If to Physician: | Dare A. Adewumi, M.D. |
|  | _____ |
|  | _____ |
| If to the Medical Group: | Attn: President, WellStar Medical Group |
|  | WellStar Health System, Inc. |
|  | 793 Sawyer Road |
|  | Marietta, GA 30062 |
| With a copy to: | EVP & General Counsel |
|  | WellStar Health System, Inc. |
|  | 793 Sawyer Road |
|  | Marietta, GA 30062 |

or to such other person and address as either party may designate in writing.

**15.6   Effect of Invalidity.**  Should any part or provision of this Agreement, for any reason, be declared invalid or illegal, such invalidity or illegality shall not affect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this Agreement had been executed with the invalid or illegal portions thereof eliminated.

**15.7   Applicable Law; Venue; Rights Cumulative.**  This Agreement shall be governed and construed in accordance with the laws of the State of Georgia, excluding Georgia's choice-of-law principles, and all claims relating to or arising out of this Agreement, or the breach thereof, whether sounding in contract, tort or otherwise, shall likewise be governed by the laws of the State of Georgia, excluding Georgia's choice-of-law principles.  The parties agree, by their signatures below, that any lawsuit, proceeding or other action arising from this Agreement shall

be brought exclusively in a superior court of Cobb County, Georgia. All rights of the parties hereunder shall be cumulative with all rights which the parties hereto may have at law or in equity.

**15.8    Amendments.**    This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof. Any amendments to this Agreement shall be in writing and signed by an authorized representative of the Medical Group, WellStar and by Physician.

**15.9    Third Party Beneficiaries.**    Nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement.

**15.10    Confidentiality.**    Except as otherwise required by law, Physician agrees to keep this Agreement and its contents confidential and not to disclose the same to any third party, except their respective legal or accounting representatives.

**15.11    No Waiver.**    No waiver of any provision of this Agreement shall be effective against either party hereto unless it is in writing and signed by the party granting the waiver. No waiver of any provision hereof shall be deemed a continuing waiver or a waiver of any other provision hereof.

**15.12    Survival.**    All obligations of the parties which have accrued as of termination of this Agreement shall survive any termination of this Agreement. In addition, the provisions of Sections 5, 9, 10, 12, 13, 14 and 15 shall survive any termination of this Agreement.

**15.13    Affiliate.**    For purposes of this Agreement, "Affiliate" shall mean entities controlling, controlled by, or in common control with WellStar, or any entity in which WellStar has a direct interest.

**15.14    Fiscal Year.**    For purposes of this Agreement, the term "Fiscal Year" shall mean July 1 through June 30 of the next calendar year.

**15.15    Special Medicare Covenant.**    The Medical Group, WellStar and Physician hereby agree to comply in all respects with the Medicare and Medicaid laws and regulations, including, without limitation, the anti-kickback and fraud and abuse provisions thereof, and no direct or indirect payments shall be made by one party to the other to induce, or in consideration of the referral by the other party of a Medicare and Medicaid patient.

**15.16    Hospital and Managed Care Applications.**    Within a reasonable time after the execution of this Agreement, not to exceed two (2) weeks, Physician shall fully and accurately complete and deliver, to the satisfaction of the Medical Group, a Medical Staff Appointment application provided by the Medical Group and all managed care applications required of Physician by the Medical Group (collectively, the "Credentialing Documents"), which shall commence Physician's direct source verification (the "credentialing and privileging process"). Additionally, Physician shall apply to become a member on the medical staff at the hospital(s) within the System as requested by the Medical Group. In the event that Physician has not delivered complete and accurate Credentialing Documents at least ninety (90) days prior to the

Commencement Date, or has not (i) become credentialed by the Medical Group, or (ii) obtained approval to become a member on the medical staff of said hospital(s), or (iii) received an unrestricted license to practice medicine and dispense drugs in Georgia, at least seven (7) days prior to the Commencement Date, the Medical Group, at its option, may extend the Commencement Date until such time as the conditions set forth in this Section 15.16 have been satisfied, or may elect to terminate this Agreement upon written notice to Physician.

**15.17  Intellectual Property.**  It is expressly understood and agreed that all concepts, inventions, improvements, programs, discoveries, developments, techniques, modifications, procedures, formulas, ideas, trade secrets, innovations, systems, programs, know-how or designs (collectively, "Intellectual Property") related to the business or activities of the Medical Group or WellStar that is conceived, developed or reduced to practice during the term hereof by Physician, shall be, and is, the exclusive property of the Medical Group or WellStar and the Medical Group or WellStar shall have all rights, title and interest therein including, but not limited to, patents, copyrights, trade secrets and other intellectual property and proprietary rights.  Such Intellectual Property also constitutes Proprietary Information of the Medical Group/WellStar and is subject to the same confidentiality, non-use and non-disclosure requirements as are contained in Section 13.2 above.  Physician agrees to execute and deliver all documents reasonably requested by WellStar relating to securing and maintaining copyrights and patent rights with respect to such Intellectual Property.  In the event that Physician desires to develop Intellectual Property and feels that Physician should retain ownership of same, before undertaking the development of same, Physician shall notify Medical Group, in writing, of the activities to be conducted by Physician and shall receive the approval of the Medical Group, in writing, prior to proceeding with such activity.

[signatures on next page]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

**MEDICAL GROUP:**

WELLSTAR MEDICAL GROUP, LLC


By:_____          _____

 　　　Alan Muster, M.D.                                          *Date Signed*
 　　　SVP, Specialty Division,
 　　　WellStar Medical Group


**WELLSTAR:**

WELLSTAR HEALTH SYSTEM, INC.


By:_____          _____

 　　　Candice L. Saunders                                      *Date Signed*
 　　　President & CEO


**PHYSICIAN:**


_____          _____

Dare A. Adewumi, M.D.                                              *Date Signed*

**EXHIBIT A**
**TO**
**PHYSICIAN SERVICES AGREEMENT ("Agreement")**
**AMONG**
**THE MEDICAL GROUP AND WELLSTAR**
**AND**
**DARE A. ADEWUMI, M.D. ("Physician")**

Physician agrees that all fees and charges arising out of Physician's services on behalf of the Medical Group during the term of the Agreement shall be and remain the property of the Medical Group. Physician irrevocably assigns and transfers to the Medical Group all right, title and interest of Physician to any fees or charges (whether in cash, accounts, goods or other property of value) resulting from or incident to Physician's practice of medicine pursuant to the Agreement and does hereby appoint the Medical Group as Physician's agent and attorney-in-fact to bill and collect the same and to enforce Physician's interest therein.

**WELLSTAR MEDICAL GROUP, LLC**

By:_____
      Alan Muster, M.D.
      SVP, Specialty Division,
      WellStar Medical Group

**PHYSICIAN:**

_____
Dare A. Adewumi, M.D.

DARE A. ADEWUMI, M.D.
PHYSICIAN SERVICES AGREEMENT
EXHIBIT B

**PHYSICIAN'S COMPENSATION:**

1.     **Compensation Terms.**  During the Initial Term of this Agreement, Physician shall be paid in consideration of the services provided under the Agreement, a guarantee base compensation at the rate of $750,000.00 per year (the "Guarantee Compensation"), and Physician will also be eligible to be paid (if earned) the value and financial incentive compensation as determined and calculated in accordance with the terms and conditions of the Compensation Plan (as defined below).  Within the period of thirty (30) days prior to the end of the first anniversary of the Commencement Date (the "Compensation Election Period"), Physician shall have the option to elect to cease receiving the Guarantee Compensation and instead, to participate in the applicable Medical Group Compensation Plan as defined below. Physician's election to cease receiving the Guarantee Compensation shall be in writing to the President of the Medical Group, shall be irrevocable and shall be effective the first pay period beginning on or after the first anniversary of the Commencement Date following the Medical Group's receipt and acceptance, in its discretion, of Physician's Election Form.  The parties understand and agree that during the Initial Term, this option to elect to participate in the Compensation Plan shall only be exercised (if at all) during the Compensation Election Period, after which, such option shall expire.  After the Initial Term of this Agreement, or following Physician's election to participate in the Compensation Plan (if such election occurs prior to the end of the Initial Term), the Medical Group shall pay Physician in consideration of the services provided under the Agreement, an annual compensation in an amount as determined in accordance with the WellStar Medical Group Compensation Plan Policy as applicable to Physician's specialty, effective on January 1, 2016, the terms and conditions of which are incorporated herein by this reference (the "Compensation Plan"), as may be amended from time to time by the Medical Group in its reasonable discretion.

2.     **Annual Maximum Compensation; General Terms.**  In no event shall the total amount of annual compensation payable to Physician at any time pursuant to this Agreement (including, without limitation, base compensation, incentive compensation, retention bonuses, and other clinical or administrative compensation (as may be applicable) exceed fair market value, and such compensation must also comply with commercial reasonableness standards. Physician acknowledges and understands that his/her compensation under the Compensation Plan and from other sources within WellStar and the Medical Group will be tested annually in accordance with industry standard, fair market value and commercial reasonableness metrics. Compensation amounts to Physician that exceed this fair market value testing process of the Medical Group, if any, shall be repaid to the Medical Group under the terms of the Compensation Plan applicable to Physician's specialty, or, in the sole discretion of the Medical Group, as otherwise agreed by and between the Physician and the Medical Group at that time. Compensation shall be paid to Physician in accordance with WellStar's regular payment methodology and policies governing such compensation; provided, however, Physician shall not be entitled to receive Physician's last compensation payment until such time as Physician has completed all hospital medical records pursuant to the applicable Medical Staff Bylaws, Rules, Regulations and Policies.

3.     **Signing Bonus.**   To induce the Physician to enter into this Agreement, the Physician shall be paid a signing bonus in the amount of $50,000.00 (the "Signing Bonus") to be paid within thirty (30) days of the Commencement Date.  If for any reason Physician fails to commence the performance of his duties as provided in this Agreement or, within two (2) years from the Commencement Date, the Physician terminates this Agreement without cause pursuant to Section 8.1, or the Medical Group terminates this Agreement for cause pursuant to Sections 8.2(i) through (xi) or Section 8.4, Physician shall refund the full amount of the Signing Bonus paid to Physician within thirty (30) days of the Physician's failure to commence his duties by the Commencement Date or the termination of this Agreement, as the case may be.

4.     **Reimbursement of Relocation Expenses.**   Subject to, and in accordance with the Medical Group policy applicable to the payment of moving expenses in effect from time to time, the Physician shall be paid up to $10,000.00 of the documented moving expenses incurred by Physician ("Moving Expenses").  If for any reason Physician fails to commence the performance of his duties by the Commencement Date or, within two (2) years from the Commencement Date, (i) the Physician terminates this Agreement without cause pursuant to Section 8.1, or (ii) the Medical Group terminates this Agreement *(a)* with cause pursuant to Sections 8.2 (i) through (xi), or *(b)* pursuant to Section 8.4, Physician shall refund the full amount of the Moving Expenses paid hereunder within thirty (30) days of a request for payment.

F:\Shr_data\LX\Specialty acq\Neurosurgical\adewumi.doc



**WELLSTAR.**
**Medical Group**

October 8, 2019

**VIA PERSONAL HAND DELIVERY**

Dare A. Adewumi, M.D.
3464 Roxboro Rd.
Apt. 1901
Atlanta, GA 30326

Re:    WellStar Medical Group
       Termination of Physician Services Agreement

Dear Dr. Adewumi:

As we discussed with you in person today, the purpose of this letter is to notify you that your Physician Services Agreement with WellStar Health System, Inc. and WellStar Medical Group, LLC, dated November 21, 2017 (the "Agreement"), is being terminated without cause pursuant to Section 8.1. The termination of the Agreement, and, therefore, your employment with WellStar Medical Group, will be effective April 5, 2020, which is the expiration of one hundred eighty (180) days from this notice of termination (the "Notice Period") meaning that your last day of full-time employment will be Saturday, April 4, 2020 (unless the Agreement earlier terminates).

In addition, and in accordance with Section 8.1, the Medical Group is hereby waiving its right for you to provide professional services on behalf of the Medical Group during the Notice Period, so you will not have any employment duties as an employed neurosurgeon of WellStar Medical Group at any office location or any WellStar Health System Hospital during this time period beginning as of today's date. You shall continue to be compensated at your normal rate of compensation for a period equal to the earlier of (i) the expiration of the Notice Period, or (ii) the date you accept employment with another employer, and we release you to such employment prior to the end of the Notice Period.

You may resolve any final work-related issues, including gathering any personal belongings, with Mr. Joey Hunt. All such matters must be approved in advance by Mr. Hunt and WellStar Human Resources. You are not to have any contact with any employee of WellStar Health System, to include any employee of WellStar Medical Group, concerning your employment status or any other matter involving WellStar Health System or WellStar Medical Group during the Notice Period. Your only contact is to be with myself, Joey Hunt or WellStar Human Resources, or any Vice President or Assistant Vice President with WellStar Medical Group who I specifically designate. As an employee of WellStar during this Notice Period, you continue to remain subject to our policies and the express terms and conditions of your Agreement, including those that survive the termination of the Agreement.

Sincerely,

Alan Muster, M.D.
SVP, WellStar Medical Group

cc:    Mr. Joey Hunt, WellStar Medical Group, Human Resources



Medical Staff Services
805 Sandy Plains Road
Marietta, GA 30066-0104
(678) 838-5970
Fax (678) 563-0680

### DARE ADEWUMI, M.D.
### Action Plan

### PERSONAL & CONFIDENTIAL
### PRIVILEGED & PEER REVIEW PROTECTED DOCUMENT PURSUANT TO
### O.C.G.A. §§ 31-7-15, 31-7-130 *et seq.*, 31-7-140 *et seq.*, & THE PATIENT
### SAFETY & QUALITY IMPROVEMENT ACT OF 2005, 42 U.S.C. §§ 299 *et seq.*

The Medical Executive Committee (the "MEC") of the WellStar Cobb Hospital (the "Hospital" or "Cobb") Medical Staff institutes this Action Plan. The continuation of your Medical Staff Membership and Clinical Privileges at the Hospital are subject to your execution of this Action Plan and your continued compliance with the same.

In the interest of patient safety, this Action Plan shall be effective upon the date of your signature below for a period of at least twelve (12) months. At the end of the twelve (12) month period, the MEC will evaluate your overall progress as more fully described in Section 9 below.

1. You must obtain at least twelve (12) hours of CME regarding neurosurgical trauma and complications, ten (10) hours of CME regarding risk management, and at least six (6) hours of CME regarding spine decompression within twelve (12) months.

2. You must complete the WellStar Medical Group Physician Resiliency Program within one (1) year.

3. The MEC strongly recommends that you arrange for an extensive mentorship with your group practice, WellStar Medical Group ("WMG"), and its neurosurgeons who practice primarily at WellStar Kennestone Hospital ("Kennestone") for a minimum of 4.5 months. During the 4.5-month period, you should spend 100% of your time working with other WMG neurosurgeons at Kennestone. The purpose of the mentorship is to immerse yourself in collaborative care, learning, and camaraderie with the other WMG neurosurgeons through participation in case conferences and Kennestone Medical Care Evaluation (MCE) Committee activities. By signing below, you hereby authorize the MEC to communicate and exchange any and all information with WMG regarding this Action Plan, including, but not limited to, focus areas of concern and your progress under the mentorship. You or your practice shall be responsible for all fees or costs associated with the mentorship. The mentorship must cover at least the following:

   a. Shadowing and observation of surgery at Kennestone;
   b. Pre-operative risk assessments;
   c. Formulation of treatment plans;
   d. Notes and documentation;
   e. Patient experience: physician communication; and
   f. Clinical decision making and critical thinking.

Prior to the end of the 4.5-month period, WMG shall submit a written report to the MEC regarding your mentoring progress. If WMG makes any recommendations regarding your care at the Hospital, you must follow and complete all recommendations set forth in WMG's report and

provide the MEC with written ongoing reports on a month-by-month basis regarding your completion and continued compliance with such recommendations. The foregoing report shall be submitted to the MEC through Dana Jones, Assistant Vice President of Medical Staff Services, as follows: by mail (805 Sandy Plains Road, Marietta, Georgia 30060) or by e-mail (Dana.Jones2@wellstar.org).

4.  The MEC strongly recommends and encourages you to discuss all of your cases, particularly complex cases, and review operative plans with other WMG neurosurgeons prior to surgery. You must submit surgery/procedure logs by the 15th of each month for the surgeries/procedures you performed during the prior calendar month on a form provided by the MEC, including the type of case, whether the case was performed at Cobb or Kennestone, and the name of the WMG neurosurgeon with whom you reviewed the case prior to surgery. The logs shall be submitted to the MEC through Dana Jones, Assistant Vice President of Medical Staff Services, as follows: by mail (805 Sandy Plains Road, Marietta, Georgia 30060) or by e-mail (Dana.Jones2@wellstar.org).

5.  You must perform and complete your own neurologically focused History & Physical ("H&P") for all of your patients within 30 days prior to surgery as required by the Medical Staff Bylaws and the WellStar Medical Record Policy. You must also update each H&P within 24 hours prior to surgery as required by the Medical Staff Bylaws and the WellStar Medical Record Policy.

6.  You must improve your medical record documentation, including your H&Ps and your Operative Notes, must improve. Your medical documentation must fully detail and accurately reflect the following:

    a.  Why the patient is having the operation or surgery;
    b.  Goals of the operation;
    c.  Details of non-operative care;
    d.  Review of imaging studies;
    e.  What procedure was chosen and why; and
    f.  Performance of a neurological exam within 24 hours of every operation or surgery.

    The Interim Vice President of Medical Affairs will review your documentation with you for compliance with these requirements.

7.  The MEC will conduct a Focused Review of 100% of your cases performed at WellStar Cobb Hospital for twelve (12) months.

8.  You must meet with the Hospital's Medical Staff President and the Interim Vice President of Medical Affairs (or their designees) to discuss your progress under this Action Plan. These meetings must take place on or before the end of the following months: July, September, and November 2019. After six months, meetings must take place at least every three (3) months. **You must call Heather Hawks at 470-732-5038 to schedule each of these meetings, and the first meeting must be conducted by July 31, 2019.** It is your responsibility to schedule each meeting. Once a meeting is scheduled, you must provide at least 48 hours advance notice if there is a need to reschedule such meeting.

9.  Following the conclusion of the twelve (12) month period of this plan, or at any time within the term of the Action Plan if deemed appropriate, the MEC will conduct a review of your progress and will determine whether any terms or conditions of this Action Plan shall be continued, modified or terminated.

10. You must sign below stating your understanding and agreement to abide by the terms set forth in this Action Plan.  Your signed agreement must be received by the WellStar Medical Staff Office, Dana Jones, Assistant Vice President of Medical Staff Services, as follows: by mail (805 Sandy Plains Road, Marietta, Georgia 30060) or by e-mail (Dana.Jones2@wellstar.org), within three (3) days of receipt of this Action Plan.  Failure to execute and submit this Action Plan shall be grounds for immediate review and may be grounds for corrective action, including, but not limited to termination or suspension of your Clinical Privileges and Medical Staff Membership.

I hereby agree to and understand each of the terms of the Action Plan as set forth above.


_____        _____
Dare Adewumi, M.D.                                             Date

# ATTACHMENT 2



October 8, 2019

**VIA PERSONAL HAND DELIVERY**

Dare A. Adewumi, M.D.
3464 Roxboro Rd.
Apt. 1901
Atlanta, GA 30326

Re:    WellStar Medical Group
         Termination of Physician Services Agreement

Dear Dr. Adewumi:

As we discussed with you in person today, the purpose of this letter is to notify you that your Physician Services Agreement with WellStar Health System, Inc. and WellStar Medical Group, LLC, dated November 21, 2017 (the "Agreement"), is being terminated without cause pursuant to Section 8.1. The termination of the Agreement, and, therefore, your employment with WellStar Medical Group, will be effective April 5, 2020, which is the expiration of one hundred eighty (180) days from this notice of termination (the "Notice Period") meaning that your last day of full-time employment will be Saturday, April 4, 2020 (unless the Agreement earlier terminates).

In addition, and in accordance with Section 8.1, the Medical Group is hereby waiving its right for you to provide professional services on behalf of the Medical Group during the Notice Period, so you will not have any employment duties as an employed neurosurgeon of WellStar Medical Group at any office location or any WellStar Health System Hospital during this time period beginning as of today's date. You shall continue to be compensated at your normal rate of compensation for a period equal to the earlier of (i) the expiration of the Notice Period, or (ii) the date you accept employment with another employer, and we release you to such employment prior to the end of the Notice Period.

You may resolve any final work-related issues, including gathering any personal belongings, with Mr. Joey Hunt. All such matters must be approved in advance by Mr. Hunt and WellStar Human Resources. You are not to have any contact with any employee of WellStar Health System, to include any employee of WellStar Medical Group, concerning your employment status or any other matter involving WellStar Health System or WellStar Medical Group during the Notice Period. Your only contact is to be with myself, Joey Hunt or WellStar Human Resources, or any Vice President or Assistant Vice President with WellStar Medical Group who I specifically designate. As an employee of WellStar during this Notice Period, you continue to remain subject to our policies and the express terms and conditions of your Agreement, including those that survive the termination of the Agreement.

Sincerely,

Alan Muster, M.D.
SVP, WellStar Medical Group

cc:    Mr. Joey Hunt, WellStar Medical Group, Human Resources

**ATTACHMENT 3**

**Mason, Erica (Ptnr-Atl)**

| | |
|---|---|
| **From:** | Dare Adewumi <dare.adewumi@gmail.com> |
| **Sent:** | Tuesday, March 24, 2020 10:56 AM |
| **To:** | Welch, Sidney (Ptnr-Atl); Mason, Erica (Ptnr-Atl) |
| **Subject:** | Fwd: [**WARNING** EXTERNAL MAIL]  COVID-19 Wellstar Cobb |

DA

Begin forwarded message:

> **From:** "Muster, Alan" <Alan.Muster@wellstar.org>
> **Date:** March 24, 2020 at 10:44:52 AM EDT
> **To:** Dare Adewumi <dare.adewumi@gmail.com>
> **Subject: RE: [**WARNING** EXTERNAL MAIL]  COVID-19 Wellstar Cobb**

> Hello Dr. Adewumi,
> First and foremost, pursuant to the letter that I sent to you last October relative to your termination notice, you are only to communicate with me regarding practice related inquiries during your notice period.  Direct emails such as the one you sent on Friday to Jody are to be sent to me during this period of time.

> Please know the health and safety of patients and team members remains our number one priority during this COVID-19 health crisis.  Incident command centers have been established at both the WellStar Health System level and WellStar Medical Group level, as well as each facility, to address all emergent and critical needs of patients and team members.  Make no mistake, WellStar is doing all it can to weather this storm.  Your offer of clinical support, while at the same time stating the alternative (i.e., if Wellstar does not accept your offer) is to continue down a path of litigation to resolve pending issues is wholly inappropriate.  Your offer of support should never have been coupled with a reminder of pending legal issues, and it shocks me to be quite honest.  Nothing changes relative to your current status and I will so inform Jody and Chad of this decision.

> Thanks
> Alan

> **Alan R Muster, MD, MBA, MHA**
> Senior Vice President, Specialty Division

> **Wellstar Medical Group**
> 793 Sawyer Rd.
> Marietta, GA 30062
> O: (470) 644-0020 C: (678) 910-1009
> Administrative Assistant: melanie.lausier@wellstar.org

1



**From:** Dare Adewumi <dare.adewumi@gmail.com>
**Sent:** Friday, March 20, 2020 5:53 PM
**To:** Hughes, Jody <Jody.Hughes@wellstar.org>
**Cc:** Muster, Alan <Alan.Muster@wellstar.org>; ckuhlman@quantumrad.com
**Subject:** [**WARNING** EXTERNAL MAIL] COVID-19 Wellstar Cobb

Dear Jody,

I hope this letter finds you well. In light of COVID-19, the potential strain on the healthcare system and providers, and WellStar's initiative to expand credentialing, bring in more physicians to help in the ER and cover hospitals where they aren't credentialed, I felt it made sense to reach out and offer my services. The rate of infection and fatalities continues to climb at an exponential rate to where we may reach a point where Cobb Hospital, WellStar Health System and the healthcare industry are stretched beyond their capacity. Despite the events of the past, I remain a physician first and foremost. Providing care for sick patients remains my professional and lifelong priority. This remains a moral obligation on my part.

Separately I feel it would be mutually beneficial to find a way to lend my services for as long as is necessary. This would not only help in resolving the outlying issues between Cobb Hospital, WellStar and myself, it would also reinforce that WellStar and all it's healthcare providers are doing all they can to weather this storm. The unfortunate alternative would be continuing down a path neither party wants to go down in the form of litigation to resolve the pending issues.

I understand this will need to be discussed amongst the powers that be. I have copied Alan Muster and Chad Kuhlman in this email. I do not enjoy sitting on the sidelines, especially when, as a fellowship trained neurosurgeon, I possess skills and knowledge that may prove vital in the coming weeks. In the event one or more of the current neurosurgeons is inadvertently exposed to the virus, the required quarantine may lead to an even more dire situation where lives are lost, while I remain a resource that is neglected. I hope you will consider my request and we can all find a way to work together in the interest of the greater good and the public health.

Sincerely,

DA

---

This email and any files transmitted with it may contain confidential and /or proprietary information in the possession of WellStar Health System, Inc. ("WellStar") and is intended only

for the individual or entity to whom addressed. This email may contain information that is held to be privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any unauthorized access, dissemination, distribution or copying of any information from this email is strictly prohibited, and may subject you to criminal and/or civil liability. If you have received this email in error, please notify the sender by reply email and then delete this email and its attachments from your computer. - Thank you.

**ATTACHMENT 4**



April 13, 2020

**VIA ELECTRONIC MAIL (erica.mason@akerman.com)**

Erica V. Mason, Esq.
Akerman, LLP
999 Peachtree Street, NE
Suite 540
Atlanta, GA 30309

Re:   WellStar Medical Group, LLC (the "Medical Group") /
      Your Client:  Dare Adewumi, M.D.

Dear Erica:

I am writing to follow up further on your March 30, 2020 e-mail in which you sent me a letter dated March 19, 2020, purportedly seeking to clarify a prior communication your client sent on March 20, 2020 to Dr. Jody Hughes with copies to Drs. Muster and Kuhlman.

In an effort to yet again delineate your client's status within the WellStar Health System, Dr. Adewumi was employed by WellStar Medical Group as a neurosurgeon pursuant to a Physician Services Agreement ("Agreement"). On October 8, 2019, WellStar Medical Group exercised its rights under the Agreement and terminated the Agreement without cause. Thus, when Dr. Adewumi sent his e-mail to Dr. Hughes on March 20, he was within his termination notice period with WellStar Medical Group. That notice specifically outlined to whom Dr. Adewumi was to communicate with regarding any issues relative to his employment during the notice period. He also was instructed not to contact other employees of WellStar Health System regarding these matters. Notwithstanding, during his notice period, Dr. Adewumi contacted Dr. Judy Hughes -- a WellStar Health System employee and interim Vice President -- under the guise of an offer of his services during the current COVID-19 healthcare crisis. Regardless of the purported reason, his action was inappropriate. As you and your client are well aware, neither Dr. Hughes nor WellStar Cobb Hospital employed Dr. Adewumi. Cobb Hospital offers medical staff privileging for independent or solo practitioners, or those practitioners otherwise employed by a medical group, who desire to admit and/or treat patients within the four walls of the hospital. Therefore, it is baffling to me that he would reach out to Dr. Hughes with a feigned offer "to return to duty at Cobb" when he was not employed by Cobb Hospital in any form or fashion nor does Cobb Hospital employ physicians in clinical roles. As such, there was no "duty" for him to return. For these reasons, Dr. Muster's characterization of Dr. Adewumi's March 20 e-mail to Dr. Hughes as "inappropriate" is accurate. Dr. Muster's action of informing Drs. Hughes and Khulman of his response to Dr. Adewumi's e-mail is no concern, as his response simply reflects a true and accurate representation of Dr. Adewumi's status within the WellStar Health System.

Likewise, Dr. Adewumi's decision to couple his feigned altruistic offer to "return to duty" with a reference to an "unfortunate alternative of continuing down a path neither party wants to go down in the form of litigation to resolve pending issues" is nothing more than a thinly veiled threat by your client and it was not well received.   As evidenced by your letter, you and Sidney sanctioned Dr. Adewumi's offer in this manner, as you believed it would present "an opportunity for him to satisfy the remaining items left under the Action Plan" – the exact issue of legal significance you and

<u>I have been discussing over the last few months</u>. Thus, any such communication should have been directed to me. Dr. Muster's interpretation of the intent behind Dr. Adewumi's March 20 e-mail is clearly supported by your letter explaining the genesis for it.

Lastly, you once again devote a significant amount of your letter to espousing Dr. Adewumi's qualifications and self-serving "irrefutable evidence" you have purportedly gathered in an effort to support his belief that there is no justification for keeping him from practicing medicine during a global pandemic. We have discussed in great detail, as set forth in my February 21 e-mail, the reasons Wellstar Medical Group chose not to have Dr. Adewumi return to clinical or surgical work during his notice period – decisions solely related to patient care and safety and which in no way discriminate nor retaliate against Dr. Adewumi. Indeed, when WellStar made the considered choice to end his Agreement in October, it was based on a host of information, including a review of the Action Plan, peer review reports, Dr. Adewumi's subsequent performance under that Action Plan with his peer group within WellStar Neurosurgery, and the professional judgment of leadership within WellStar Neurosurgery and WellStar Medical Group. Simply put, WellStar had no desire to delay its decision until a point in time wherein Dr. Adewumi had an outcome that led to a serious sentinel or other event within WellStar Health System. A pandemic healthcare crisis does not override our caution in ensuring we treat patients with clinicians who do not pose an undue threat to patient safety. Between the contents of the peer review reports and the professional judgments of learned colleagues within WellStar Medical Group, we have more than enough evidence to support our decision-making process.

As Dr. Adewumi's employment with WellStar Medical Group has concluded, he is certainly free to join any new employer that desires his professional services. He also can easily explain and offer his version of events surrounding the Action Plan, particularly since it was an Action Plan that was not reportable. WellStar will only report its existence if requested as previously explained. Further, as I stated in my April 2 e-mail, his status remains unchanged, and there is no desire to further employ Dr. Adewumi for any interim period.

Sincerely,

/s Chuck

Charles L. Carder, III
AVP & Assistant General Counsel, WellStar Health System

# ATTACHMENT 5



**Neurosurgery**
61 Whitcher Street
Suite 3110
Marietta, GA 30060
T: 770.422.2326
F: 770.422.7797

To whom it may concern:

This letter is written in support of Dr. Dare Adewumi for consideration of employment as a neurosurgeon in your hospital system. I have known Dr. Adewumi professionally and personally for three years. During that time period I have had the opportunity to interact with him professionally and personally on a continual basis.

Dr. Adewumi completed his medical school education at the Medical College of Georgia in Augusta, GA after which he went on to complete his neurosurgical residency at Loma Linda University in California. He continued his neurosurgical training by completing a spine fellowship at the Swedish Neuroscience Institute in Seattle, and a surgical neurooncology fellowship at Emory University in Atlanta, GA. I came to be acquainted with Dr. Adewumi during his employment as a neurosurgeon for the WellStar Medical Group in Atlanta, GA.

In my personal interactions with Dr. Adewumi I have found him to be collegial, professional and an individual of sound moral character and integrity. Dr. Adewumi is a dually trained, proficient neurosurgeon with a unique surgical skill set that will make him an asset to any hospital system. I support his application for employment within your hospital system. If any additional information is required please do not hesitate to contact me.

Respectfully,

*William Humphries, M.D., MPH*
Cerebrovascular/Endovascular Neurosurgery
WellStar Neurosurgery
61 Whitcher Street
Suite 3110
Marietta, GA 30060
william.humphries@wellstar.org
Phone (770)422-2326
Fax (770)422-7797

