IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DR. DARE ADEWUMI,             :
                                         :
       Plaintiff,           :
                                         :     CIVIL ACTION FILE NO.:
v.                                 :     1:21-CV-4048-CAP-JCF
                                         :
WELLSTAR MEDICAL GROUP,   :
WELLSTAR HEALTH SYSTEMS, INC.  :
and NORTHSIDE HOSPITAL, INC.,   :
                                         :
       Defendants.       :

## NON-FINAL REPORT and RECOMMENDATION

This case is before the Court on the Motion to Seal and Motion to Dismiss filed by Defendants Wellstar Medical Group ("WMG") and Wellstar Health Systems, Inc. ("WHS") (Doc. 9, Doc. 19, respectively) and the Motion to Dismiss filed by Defendant Northside Hospital, Inc. ("Northside") (Doc. 15). It is **RECOMMENDED** that WMG and WHS's motion to seal be **DENIED**, that their motion to dismiss be **GRANTED in part and DENIED in part**, and that Northside's motion to dismiss be **GRANTED**.

## Procedural History

On September 30, 2021, Plaintiff filed a Complaint alleging the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII") by discriminating against him based on his race and color (Doc. 1 ¶ 71) and

1

42 U.S.C. § 1981 ("§ 1981") by discriminating against him based on his race (*Id.* ¶¶ 68-70). On October 15, 2021, WMG and WHS (collectively, "the Wellstar Defendants") filed their Motion to Seal. (Doc. 9). The Court issued an Order provisionally sealing Plaintiff's Complaint and allowing the Wellstar Defendants to provisionally file their responsive materials under seal. (Doc. 11). Plaintiff filed a response opposing the Motion to Seal on October 25, 2021. (Doc. 17). The Wellstar Defendants replied on November 1, 2021. (Doc. 21).

On October 22, 2021, Northside filed its Motion to Dismiss Plaintiff's Complaint. (Doc. 15). Plaintiff responded on November 5, 2021. (Doc. 22). Northside replied on November 14, 2021. (Doc. 25). Meanwhile, on October 27, 2021, the Wellstar Defendants filed their Motion to Dismiss Plaintiff's Complaint. (Doc. 19). Plaintiff responded on November 12, 2021. (Doc. 23). WMG and WHS replied on November 24, 2021. (Doc. 27).

With briefing complete on those motions, the undersigned now considers their merits.

## **Factual Allegations**

The factual allegations listed here are taken from Plaintiff's Complaint, Plaintiff's EEOC Charge of Discrimination attached to the Complaint (Doc. 1-1 at 2-16), and attachments to the EEOC Charge, including the Physician Services Agreement between Plaintiff and the Wellstar Defendants (Doc. 1-1 at 18-35).

2

"Under the Federal Rules of Civil Procedure, attachments to the complaint are considered part of the pleading for all purposes." *Rice v. Guardian Asset Mgmt. Inc.*, Case No. 21-13188, 2022 WL 1763816, at *3 (11th Cir. Jun 1, 2022) (unpublished opinion) (citing FED. R. CIV. P. 10(c); *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205 (11th Cir. 2007)); *see also In re Miller Indus., Inc. Sec. Litig.*, 12 F.Supp.2d 1323, 1327 (N.D. Ga. 1998) ("Exhibits and affidavits attached to the complaint may also be considered as part of the complaint.") (citing FED. R. CIV. P. 10(c)). Thus, the Court can consider the attachments to Plaintiff's Complaint for purposes of deciding the present motions. Further, when a complaint refers to a document and that document is central to the plaintiff's claims, a court can consider that document when resolving a motion to dismiss. *Brooks v. Blue Cross and Blue Shield of Fl., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). Here, Plaintiff has referred to his EEOC Charge and the Physician Services Agreement in his Complaint (Doc. 1 ¶¶ 4, 8), and they are each central to his claims. The EEOC Charge is central to Plaintiff's Title VII claims as its timely filing with the EEOC is a condition precedent to bringing suit under that statute. The Physician Services Agreement is central to Plaintiff's claims against the Wellstar Defendants because, as discussed further below, it defined Plaintiff's relationship with each of those defendants. Therefore, the Court may consider those documents in deciding the motions to dismiss.

Plaintiff is "an African doctor of dark skin color." (Doc. 1 ¶ 1). He also states in his EEOC Charge that he is black, and he refers to "other African American" physicians, inferring that he is also African American. (Doc. 1-1 at 7). Plaintiff's "family is from Nigeria." (Doc. 1 ¶ 5). He attended college and medical school in the United States. (*Id.* ¶ 6). At all times relevant to the events underlying his claims, he was a board-eligible neurosurgeon. (*Id.* ¶ 7). Plaintiff alleges that WMG and WHS, whom he collectively refers to as "Wellstar" throughout his Complaint, "are employers conducting business within this judicial district." (*Id.* ¶ 3).

On March 19, 2018, Plaintiff signed a "Physician's Service Agreement" ("the Service Agreement") with WMG and WHS "to lead their Neurosurgery line of service at Wellstar Cobb Hospital…." (Doc. 1 ¶ 8). The Service Agreement states that WMG is a Georgia LLC that "manages and operates a tax-exempt medical care group providing physician services in Georgia…." (Doc. 1-1 at 18). WHS is a Georgia nonprofit corporation that "operates and manages acute care hospitals located…in metropolitan Atlanta and other various locations in Georgia…." (*Id.*). The Service Agreement refers to the hospitals managed by WHS "collectively, including any other hospital subsequently operated by [WHS] or a subsidiary" as the "System Hospitals" or the "Hospitals," and it refers to the System Hospitals, together with WMG, as the "System" or the "WellStar Health System". (*Id.*). Further, the Service Agreement states that "[WMG] desires to employ [Plaintiff] to provide

4

medical services for the Medical Group as part of its integrated health care delivery system[.]" (*Id.*).

Plaintiff asserts in his EEOC Charge that the Wellstar Defendants acted as his "joint employers" and as an "integrated enterprise" at all times relevant to his claims. (Doc. 1-1 at 7). He contends that they were both parties to the Service Agreement; notes that the Service Agreement requires that he maintain WHS credentials in order to remain employed with WMG; that WHS's website states that it "formed WMG to provide 'hospital-employed physicians' for its Health System"; and WMG and WHS "share common management, administrative, and operational overlap." (*Id.*). Further, he contends that "everyone in management at WMG is also connected to WHS, and there are numerous conflicts of interest between them, making a fair and impartial investigation into their misconduct nearly impossible[.]" (*Id.*). For example, Plaintiff asserts that he was supervised within WMG by Dr. William Benedict ("Dr. Benedict"), who oversees WMG's Neurosurgery Division and works at WHS's Wellstar Kennestone Hospital. (*Id.*; Doc. 1 ¶¶ 9-10). Dr. Benedict's supervisor was Dr. Alan Muster ("Dr. Muster"), a WMG Pulmonologist and Senior Vice President of Specialty Medical Services." (Doc. 1-1 at 7; Doc. 1 ¶ 15). Within WHS, Plaintiff's "supervisory structure include[d] Dr. Jody Hughes, WHS Cobb Chief of Staff and Chair of WHS Cobb's Medical Executive Committee ("MEC")[,]" who is also "employed by WMG as a Pulmonologist, where he works

with, and under the supervision of, Dr. Muster." (Doc. 1-1 at 7-8). "WHS Cobb's MEC has oversight responsibility over all hospital-physician relationships and credentialing. Dr. Benedict served as an *ad hoc* member" of Wellstar Cobb's MEC. (*Id.* at 8).

Several months into Plaintiff's employment, Plaintiff alleges that "defendant Wellstar began providing [him] with letters of inquiry raising issues which allegedly had occurred during surgeries he performed." (Doc. 1 ¶ 11). Letters of inquiry ("LOIs") can be filed anonymously and the subject physician is not advised of the source of the letter. (*Id.* ¶ 12). Typically, each LOI is "reviewed by a peer review committee" and the doctor who is the subject of the LOI is allowed to submit a response to the MEC before it determines whether additional independent scrutiny of a particular incident is needed. (*Id.* ¶¶ 13-14).

Despite that typical process, Dr. Benedict performed the peer review of Plaintiff's LOIs alone. (*Id.* ¶¶ 18-19). Plaintiff requested that the LOIs be reviewed by the Neurosurgery Department, but Dr. Benedict refused to allow anyone else to conduct the review of Plaintiff's LOIs. (*Id.*). Dr. Benedict deemed five of the nineteen LOIs involving Plaintiff to be worthy of external review. (*Id.* ¶ 20). "In four of those five cases, the external reviews noted concerns regarding [P]laintiff's approach or surgical technique;" but the external reviewer did not find that Plaintiff had breached any standards of care in any of those cases. (*Id.* ¶ 21). In the fifth case,

the external review yielded no concerns. (*Id.* ¶ 22). Additionally, "[a]n independent review conducted by a nationally known neurosurgeon confirmed that [P]laintiff had engaged in no conduct inconsistent with established standards for patient care in any of th[o]se cases." (*Id.* ¶ 23).

Around the same time that he was receiving the LOIs, Plaintiff began complaining to Dr. Muster that he was not receiving support he needed as he attempted to "re-establish neurosurgery services at Wellstar-Cobb…." (*Id.* ¶¶ 15-16). In response, Dr. Muster suggested that Plaintiff resign and gave him no assistance. (*Id.* ¶ 17).

In August 2019, "based on the number of [LOIs]" involving Plaintiff, and at Dr. Benedict's behest, "defendant Wellstar" placed Plaintiff on a one-year performance improvement plan, or Action Plan. (*Id.* ¶ 24). "Defendant Wellstar" claimed that the Action Plan would "help better integrate [P]laintiff with the neurosurgeons working within the much larger Kennestone Hospital Neurosurgery Department." (*Id.* ¶ 30). Plaintiff accepted the Action Plan. (*Id.* ¶ 31).

Plaintiff alleges that the Wellstar Defendants did not treat white doctors who engaged in "like practices or worse" similar to the way they treated him, "failing to either prepare [LOIs],…initiate external reviews[,] or to place them on such Action Plans." (*Id.* ¶ 26). Specifically, Plaintiff alleges that a Caucasian neurosurgeon, Dr. Phillip Parry ("Dr. Parry"), pressured a junior physician into performing an

"unnecessary 'emergency' surgery" on an 83-year-old patient based on information Dr. Parry had reviewed a few days prior. (*Id.* ¶ 27). Plaintiff told Dr. Benedict and Dr. Muster that Dr. Parry had "misrepresented his own care of [that] patient and caused [the] unnecessary surgery," but Dr. Benedict did not initiate any review that case. (*Id.* ¶ 28). Instead, Dr. Benedict "reprimanded" Plaintiff for not seeing that patient in the emergency department. (*Id.* ¶ 29).

In late August 2019, Plaintiff met with the leaders of the Wellstar Cobb Hospital MEC "for a check in" on his Action Plan. (*Id.* ¶ 32). They "praised his work toward completing" items in his Action Plan, noted that he was ahead of schedule for completing that plan, and brought up the possibility of releasing him from the plan early. (*Id.*). That action was within the discretion of the MEC, and they told Plaintiff that other doctors had been released from Action Plans early. (*Id.* ¶ 33). At that same meeting, Plaintiff complained to the MEC of what he perceived to be "unfair judgments" against him by Dr. Benedict and "discussed at least one specific instance of [unfairness]." (*Id.* ¶ 34). Plaintiff alleges MEC members "agreed with [him] and assured him that Dr. Benedict would not be permitted to sabotage his successful completion of the Action Plan." (*Id.* ¶ 35). They also told Plaintiff to document his own work and stated that Dr. Benedict "would not be preparing the report of [P]laintiff's mentoring experience at Kennestone[,]" which was part of his Action Plan. (*Id.* ¶¶ 36, 44). However, Dr. Benedict did eventually complete that

final report, where he made adverse remarks about Plaintiff's care of the aforementioned 83-year-old patient. (*Id.* 37).

Following that late-August 2019 meeting with the MEC, Plaintiff continued to comply with the Action Plan and "received very positive feedback during his three months on it." (*Id.* ¶ 38). During that time, Dr. Benedict used the Action Plan "as a punitive mechanism, stating that he would make [P]laintiff's time at Kennestone 'like residency' all over again." (*Id.* ¶ 39). Between August and October 2019, Plaintiff did not receive any more LOIs. (*Id.* ¶ 40).

On October 8, 2019, "without prior notice," Dr. Muster gave Plaintiff a "no cause" termination letter advising that "defendant Wellstar" intended to terminate his employment effective April 5, 2020. (*Id.* ¶ 41). During that conversation, Dr. Muster "agreed that [Plaintiff] had done 'nothing wrong' and told [P]laintiff he was being fired because 'certain relationships were not fostered,' and that the neurosurgery team had reached a consensus to terminate his contract." (*Id.* ¶ 42). Plaintiff alleges that the neurosurgery team had not reached a consensus to terminate him, as "no meeting of the neurosurgery team at Kennestone was held to consider the issue…." (*Id.* ¶ 43). At the time he received his termination letter, Plaintiff had completed every item in his Action Plan except six weeks of mentoring at Kennestone Hospital. (*Id.* ¶ 44). According to Plaintiff, "Defendant Wellstar did not

similarly separate white doctors with performance concerns similar" to those of Plaintiff. (*Id.* ¶ 50).

After October 8, 2019, "defendant Wellstar" did not allow Plaintiff to complete the mentoring required by his Action Plan, "violating provisions of their contract which required defendant to provide [P]laintiff with office space, supplies and staff during the full term of his agreement." (*Id.* ¶ 45). "[D]efendant Wellstar did not allow [Plaintiff] to return to work so he could complete the Action Plan, a condition precedent to his receipt of a 'letter in good standing.'" (*Id.* ¶ 46). "[D]efendant Wellstar" also represented to Plaintiff that it would "advise prospective employers that [P]laintiff was NOT in good standing because he had not completed the Action Plan." (*Id.* ¶ 47).

During the next several months, Plaintiff sought to either complete his mentoring at Wellstar Cobb or, in the alternative, secure a decision from the Wellstar Cobb MEC that he had completed his Action Plan. (*Id.* ¶ 48). However, "defendant Wellstar refused to allow [P]laintiff to mitigate his damages." (*Id.* ¶ 49). Plaintiff sought, but never received, the letter of good standing that he needed to pursue other career opportunities. (*Id.* ¶ 51). That harmed his efforts to gain comparable employment. (*Id.* ¶¶ 52-53).

In July 2020, Plaintiff signed a six-month "Locums Tenens" contract with Northside at a salary comparable to what he earned at Wellstar. (*Id.* ¶ 54). However,

his time spent out of work prior to that costs "him approximately $250,000 in monetary loss." (*Id.* ¶ 55).

In the fall of 2020, Northside told Plaintiff "that it would not offer him available full-time employment in which he expressed interest and for which he fully qualified[,]" despite Plaintiff's "fully satisfactory performance during his six-month contract, his express request to be considered for an available position in the department and the availability of vacant positions within his specialty." (*Id.* ¶¶ 56-57). During his time at Northside, Plaintiff "took on leadership roles and performed functions above those expected or asked of him[,]" "worked to mend damage[d] relationships between the Neurosurgery and Radiology Departments[,]" "attended trauma committee meetings to help [Northside] maintain its trauma designation[,]" and "took more calls than other similarly hired physicians and was repeatedly asked to back-up physicians unable to take their shifts." (*Id.* ¶¶ 58-61). Instead of offering Plaintiff a full-time position, Northside offered it to a Caucasian doctor, Evan Winograd ("Dr. Winograd"), "who had also worked as a Locums Tenens, but lacked [P]laintiff's practice experience and demonstrated competency while in [Northside's] employment." (*Id.* ¶ 62).

In January 2021, during Plaintiff's continued search for employment, a hospital in Dayton, Ohio told him that "Wellstar Cobb had advised that he was subject to an Action Plan where his privileges were automatically resigned due to

his failure to satisfy the threshold eligibility criteria on a continuous basis." (*Id.* ¶ 63).

Based on the above allegations, Plaintiff contends that "defendant Wellstar intentionally and wantonly violated [his] right to engage in a contract with it on the basis of his race in violation of [§ 1981], terminating his contract with it on grounds not deemed sufficient to treat similarly qualified and situated white doctors." (*Id.* ¶ 68). Plaintiff also alleges that "through its conduct and on the basis of [his] race, defendant Wellstar intentionally interfered in his obtaining a contract with other employers on the same basis that Caucasian doctors were so employed, in violation of [§ 1981.]" (*Id.* ¶ 69). Further, Plaintiff claims "through the conduct set forth above, defendant Northside intentionally and wantonly violated [his] right to engage in a contract on the basis of his race in violation of [§ 1981.]" (*Id.* ¶ 70). Lastly, Plaintiff claims that "[b]y and through the actions and omissions set forth above, defendants violated Title VII [] by subjecting [him] to disparate terms and conditions of employment on the basis of his race/color and by terminating his employment on the same illegal bases." (*Id.* ¶ 71).

## Discussion

### I.     Motion To Seal

The Wellstar Defendants have moved for the Court to enter an order "sealing from the public record confidential medical peer review information and materials

contained in or attached to the Complaint." (Doc. 9 at 1). They also ask that the Court "grant all Defendants leave to file portions of their Responsive Pleadings that respond directly to the confidential medical peer review information contained in the Complaint under seal." (*Id.* at 2). Specifically, Wellstar Defendants assert that Plaintiff's Complaint revealed "strictly confidential information that occurred during a privileged medical peer review process relating to Plaintiff's neurosurgical treatment of patients and patient safety outcomes" when carrying out his duties on behalf of WMG and WHS. (Doc. 9-1 at 2-3) (citing Doc. 1 ¶¶ 11, 12, 13, 14, 15, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 44, 45, 46, 47, 48, & 63 ("Confidential Allegations")). The Wellstar Defendants also contend that the copy of the Action Plan that the Cobb MEC imposed on Plaintiff, which he attached to his Complaint (Doc. 1-1 at 37-39 ("Confidential Attachment')), is also confidential. (Doc. 9-1 at 3). In their reply brief, the Wellstar Defendants ask for the first time that their motion to dismiss, or at least portions of that motion that are responsive to the Confidential Allegations, be permanently sealed and that the EEOC Charge attached to Plaintiff's Complaint be sealed because it parrots many of the Confidential Allegations from the Complaint. (Doc. 21 at 4 n.3).

"Material filed in connection with any substantive pretrial motion, unrelated to discovery, is subject to the common law right of access." *Romero v. Drummond Co.*, 480 F.3d 1234, 1245 (11th Cir. 2007). The Eleventh Circuit has treated

pleadings and exhibits attached to them as judicial records subject to a presumption of accessibility to the public. *F.T.C. v. AbbVie Prods., LLC*, 713 F.3d 54, 62-63 (11th Cir. 2013). "[T]here is a presumption of public access to court records," and "only the most extraordinary circumstances and compelling reasons justify sealing any court record." *Jackson v. Deen*, No. CV412-139, 2013 U.S. Dist. LEXIS 187600, at *52-53 (S.D. Ga. Apr. 3, 2013); *see also Isaac v. Am. Intercontinental Univ.*, No. 1:05-CV-2839-JEC, 2007 U.S. Dist. LEXIS 47409, at *22 (N.D. Ga. June 28, 2007) (explaining that " '[o]nce a matter is brought before the court for resolution, it is no longer solely the parties' case, but also the public's case. Absent a showing of extraordinary circumstances . . . the court file must remain accessible to the public' " (quoting *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013, 1016 (11th Cir. 1992))).

"The common law right of access may be overcome by a showing of good cause, which requires 'balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential.' " *Romero*, 480 F.3d at 1246 (quoting *Chi. Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1309 (11th Cir. 2001)). "In balancing the public interest in accessing court documents against a party's interest in keeping the information confidential, courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the

14

information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Id.* "A party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information." *Id.*

In their initial brief, the Wellstar Defendants mention the *Romero* factors but do not actually discuss their applicability to the information and filings at issue here. Instead, they note that Georgia law recognizes a privilege preventing the disclosure of matters pertaining to medical peer review processes. (Doc. 9-1 at 4) (citing O.C.G.A. §§ 31-7-133 and 31-7-143). They also note the Patient Safety and Quality Improvement ACT of 2005 ("PSQIA"), a federal statute that privileges "patient safety work product" in certain situations. (*Id.*) (citing 42 U.S.C. § 299b021, *et seq.*). They then cite a decision of the U.S. District Court for the Middle District of Georgia, *Mawulawde v. Bd. of Regents of Univ. Sys. Of Georgia*, No. CV 105-099, 2009 WL 10678751, at *4 (S.D. Ga. Mar. 27, 2009). In *Mawulawde*, the court sealed a plaintiff's proposed amended complaint because it contained "direct quotes from documents designated as peer review material and produced by the [the defendants] during the peer-review discovery period." *Id.* Based on that authority, the Wellstar Defendants conclusorily assert that good cause exists for the Court to seal Plaintiff's Complaint and the copy of Plaintiff's Action Plan attached thereto. (Doc. 9-1 at 5).

In response, Plaintiff argues that the *Romero* factors dictate that the Wellstar Defendants' motion to seal should be denied. (Doc. 17-1 at 2-4). Specifically, Plaintiff argues that allowing public access to his Complaint and the Action Plan attached to his Complaint would not impair court functions, that "there is no legitimate privacy interest in concealing racial discrimination or its operation[,]" that the Wellstar Defendants did not establish any injury that would arise from allowing public access to the Confidential Allegations and Attachment, that Plaintiff's allegations are reliable, that the Wellstar Defendants will have an opportunity to respond to the Confidential Allegations, that discrimination is a matter of public concern and national interest, and that there is no reason to protect the information at issue from being accessed by the public. (Doc. 17-1 at 2-3). Plaintiff then spends a considerable amount of effort explaining why the state and federal privileges cited by the Wellstar Defendants do not require sealing of any documents in question here. (*Id.* at 4-7). Lastly, Plaintiff attempts to distinguish this case from *Mawulawde*. (*Id.* at 7).

In reply, the Wellstar Defendants point to *Adkins v. Christie*, 488 F.3d 1324 (11th Cir. 2007), where the Eleventh Circuit held that there is no recognized "medical peer review privilege" in federal discrimination cases. (Doc. 21 at 5). In refusing to apply that privilege in federal court, the Eleventh Circuit "recognize[d] that health care providers…have a legitimate interest in keeping peer review

documents confidential and in protecting them from widespread dissemination." *Id.* at 1329. But the Eleventh Circuit emphasized the difference between privileging documents and preserving their confidentiality once produced. *Adkins*, 488 F.3d at 1329. The *Adkins* court explained that even in the absence of an evidentiary privilege, district courts could protect medical care providers' interests in keeping peer review documents confidential "through other established means such as protective orders, confidentiality agreements, and when appropriate, by disclosure only after in-camera review of these documents…[or] redaction of extraneous or confidential information[.]" *Id.* at 1329-30.

The Wellstar Defendants then argue that the *Romero* factors support sealing Plaintiff's Complaint. They contend that they have a "legitimate privacy interest in keeping medical peer review information confidential so they can engage in confidential reviews of patient care and outcomes to make improvements without fear that this will negatively impact them" and that "allowing public access to confidential medical peer review materials harms [their] legitimate privacy interests[;]" that the degree and likelihood of harm if Plaintiff's Complaint and Confidential Attachment is not sealed is significant, as medical institutions would "be compelled to stop engaging in medical peer review processes, which improve patient care and outcomes[;]" that Plaintiff's "perception of the events" outlined in his Complaint is unreliable; that the Wellstar Defendants will not be able to respond

17

to the Confidential Allegations "without disclosing additional confidential information related to the medical review process[;]" that the peer review process does not concern public officials or matters of public concern; and there are no less onerous means of protecting the information in Plaintiff's Complaint from the public other than sealing that document. (*Id.* at 6-7).

Before discussing the *Romero* factors, it is necessary to generally describe the information Defendant seeks to have sealed. The first group of allegations identified by the Wellstar Defendants states that Plaintiff was the subject of a number of LOIs, generally describes the peer review process at Wellstar Cobb, and state that Plaintiff complained to Drs. Benedict and Muster at the time about the lack of support he was receiving in his role. (Doc. 1 ¶¶ 11-15). The next group of allegations states that Dr. Benedict conducted the required peer review of Plaintiff's LOIs and found that five of the underlying incidents were worthy of external review; that the external reviewer "noted concerns" about Plaintiff's surgical technique in four of those five cases, but found no breach of standard of care in any case; that an independent review of each incident was also performed by another external reviewer; that Plaintiff was placed on an Action Plan based on the number of LOIs he received; that white doctors, including Dr. Parry, were not similarly subjected to review or placed on an action plan for purported mistakes; describe one particular purported mistake by Dr. Parry; notes Dr. Benedict's decision not to initiate a review of that

incident; and then generally describes Plaintiff's positive performance on his Action Plan. (*Id.* ¶¶18-40). The remaining Confidential Allegations state that Plaintiff was not allowed to complete his Action Plan after his termination despite his efforts to do so, that the Wellstar Defendants told Plaintiff they would advise prospective employers that Plaintiff was not in good standing with them because of his failure to complete his Action Plan, and that one Ohio hospital to which Plaintiff applied told him that the Wellstar Defendants have advised that he had been subjected to an Action Plan and that his privileges with them were resigned. (*Id.* ¶¶ 45-48, 63).

This Court should not seal any of the documents or information in question at this time, as the Wellstar Defendants have not met their burden of showing good cause for doing so.

Regarding the first *Romero* factor, the Wellstar Defendants have not articulated a legitimate privacy interests in the specific information in question so great that it must outweigh the public right of access. They have only identified a vague interest in keeping all information related to the medical peer review process private so that "they can engage in confidential reviews of patient care and outcomes to make improvements without fear that this will negatively impact them." (Doc. 21 at 6). However, they do not explain why they have such a strong privacy interests in the specific information at issue here or identify the specific negative impact that would flow from allowing the documents and information in question from being

publicly accessible. At best, they allude to a general fear that making any information whatsoever regarding Wellstar Cobb's peer review process available to the public would chill that process. At least one other district court in this circuit has held that the vague privacy interests alluded to by the Wellstar Defendants is not sufficient to warrant sealing medical peer review material. In *Wood v. Archbold Medical Center, Inc.*, No. 7:07-cv-109 (HL), 2009 WL 3418162, at *2 (M.D. Ga. Oct. 14, 2009), the Middle District of Georgia rescinded several orders that had sealed peer review documents filed in connection with a motion for summary judgment. The *Wood* court was unconvinced by the hospital-defendants' argument that the peer review documents there should remain under seal because of concern that making such documents accessible to the public would "chill the peer review process, generate medical malpractice litigation and compromise private patient information." *Id.* (citing *Johnson v. Greater Southeast Comm. Hosp. Corp.*, 951 F.2d 1268 (D.C. Cir. 1991) (applying factors similar to those in *Romero* and holding that it was insufficient to show good cause to warrant sealing medical peer review documents by "merely [] allud[ing] to the Hospital's general interest in keeping peer review processes out of the public eye[,]" because "[t]hat rationale sweeps far too broadly")). Like the defendants in *Wood* and *Johnson*, the Wellstar Defendants have merely alluded to a general interest in keeping information regarding the peer review process at Wellstar Cobb out of the public eye for fear of chilling the peer review

process. Thus, like the courts in those cases, the undersigned is not convinced that those general interests warrant sealing the documents at issue here, especially where the allegations and document in question here reveal nothing about any specific investigative or deliberative work done by the peer review committee at Wellstar Cobb. Instead, Plaintiff's Complaint and the Action Plan simply refer to final conclusions reached by Wellstar Cobb's peer review committee and an external reviewer that they consulted.

The Wellstar Defendants appear to be asserting that the interests protected by Georgia's peer review privilege laws, which the *Adkins* court has held do not apply in federal discrimination cases, and those protected by the PSQIA, which may or may not apply later in this litigation, justify sealing the documents in question here. The undersigned disagrees. In *Adkins*, the Eleventh Circuit acknowledged that defendant's arguments that making peer review materials accessible could "chill supervising physicians, making them less candied in their performance evaluations of staff physicians for fear that their assessments and statements might be sued for improper purposes[,] such as generating medical malpractice litigation." *Id.* at 1328. It also acknowledged concerns about patient confidentiality being breached if peer review material were disclosed. *Id.* In holding that Georgia peer review privilege laws do not apply in federal discrimination actions, the *Adkins* court acknowledged that health care providers have "a legitimate interest in keeping peer review

documents confidential" and noted that there are mechanisms for doing so short of providing a medical peer review privilege. *Adkins*, 488 F.3d at 1329. But the undersigned is not convinced, and the Wellstar Defendants do not explain, how the concerns underlying medical peer review privilege laws referenced in *Akins* are implicated by the specific information in question here. Neither the Confidential Allegations nor Plaintiff's Action Plan contain specific, identifying information regarding any patients or patient care outcome. Neither do they contain specific references to any work product of the peer reviewers at Wellstar Cobb. The most specific information they contain regarding the peer review process at Wellstar Cobb is the MEC's decision to refer five of Plaintiff's LOIs to an external reviewer, the external reviewer's final conclusions, and the MEC's decision to place Plaintiff on an Action Plan. Those general allegations do not contain any information that could compromise patient confidentiality or otherwise be linked back to a specific patient care outcome for purposes of malpractice litigation. The same goes for Plaintiff's Action Plan attached to his Complaint. The Action Plan contains no information about any particular patient or patient care outcome, and it contains no specific peer review work product. It only describes actions Plaintiff was required to take to improve his performance at Wellstar Cobb. Thus, it does not implicate the types of concerns cited in *Adkins* that underly state peer review privilege laws.

Further, the Wellstar Defendants make much of the Eleventh Circuit's language in *Adkins* explaining that part of its rationale for refusing to create an evidentiary privilege for peer review material in federal discrimination cases is that district courts could protect health care providers' privacy interests in medical peer review documents through less restrictive means. (Doc. 21 at 5) (citing *Adkins* 488 F.3d at 1329-30). But that language is not controlling here. Importantly, the *Adkins* court was not discussing the merits of sealing judicial records such as pleadings, attachments to pleadings, or documents filed in support of dispositive motions, which are subject to the public right of access and a presumption of accessibility. *See AbbVie Prods.*, 713 F.3d at 62-63. Instead, the *Adkins* court was discussing ways in which district courts could protect peer review documents theoretically produced in discovery, which are not subject to the public right of access. Thus, the *Adkins* court provided no *Romero*-style analysis, and the language cited by the Wellstar Defendants is not controlling in this situation.

The undersigned is also unconvinced by *Mawulawde*, cited by the Wellstar Defendants, as it is distinguishable from the circumstances here. In *Mawulawde*, the district court sealed a proposed second amended complaint because it contained direct quotes from a medical peer review document that had been produced in discovery in that case. *Mawulawde*, 2009 WL 10678751, at *4. The quoted document had been designated as peer review material and was subject to a

protective order by that court that applied "to all documents and products of discovery that contain peer review material." *Id.* Further, the proposed second amended complaint there was not the operative complaint, as the *Mawulawde* court denied that plaintiff's motion to file that complaint. *Id.* at *17. On the other hand, here, the Wellstar Defendants are not asking the Court to seal a proposed complaint, but Plaintiff's operative Complaint, attachments to it, their motion to dismiss, and responsive pleadings, all of which are subject to the public right of access and a presumption of accessibility. Moreover, Plaintiff's Complaint does not contain any direct quotes from the Action Plan or any other documents produced by peer reviewers at Wellstar Cobb, but only descriptions of general conclusions reached regarding Plaintiff's performance. Thus, the undersigned sees no reason as of yet to seal Plaintiff's Complaint or the other documents at issue.

As for the second *Romero* factor, the Wellstar Defendants imply that allowing the documents at issue here to be publicly accessible would compel health care providers to stop engaging in the medical peer review process entirely, which would harm patient care and outcomes. (Dc. 21 at 6). The undersigned is simply not convinced that such a dramatic consequence would result from the general public having access to Plaintiff's allegations describing decisions made and conclusions reached during the peer review process at Wellstar Cobb that are not traceable to any

particular patient or patient outcome. Thus, this factor does not weigh in favor of sealing.

The Wellstar Defendants also argue that Plaintiff's allegations pertaining to the peer review process are unreliable, and the defendants will be forced to disclose additional peer review information in order to refute those allegations. Of course, there is no real way to assess the reliability of Plaintiff's allegations at this stage of the litigation. Further, to the extent the Wellstar Defendants are concerned about having to reveal more information in discovery in order to sufficiently refute Plaintiff's allegations regarding the peer review process at Wellstar Cobb, they can implement measures to protect such information through an agreement with Plaintiff or by moving the Court to do so when the time arises. At this time, the possibility that the Wellstar Defendants may have to reveal additional peer review information to refute Plaintiff's allegations does not warrant sealing the documents in question here. Lastly, the final two *Romero* factors cut in favor of sealing the documents at issue, as this case does not involve public officials or matters of public concern (which the undersigned interprets as matters involving governmental affairs), and there is no less onerous way to protect the information in question from public disclosure other than sealing at this time. However, looking at the *Romero* factors on balance, considering the types of documents and information the Wellstar Defendants are asking the Court to permanently seal, and considering that the

specific information at issue does not implicate a strong privacy interest or significant harm if allowed to remain publicly accessible, the Court should not seal the documents in question.

For those reasons, the Wellstar Defendants have not demonstrated that there is good cause for sealing portions of Plaintiff's Complaint, attachments to his Complaint, their responsive pleading, or their motion to dismiss. It is **RECOMMENDED** that their Motion to Seal be **DENIED**. If that recommendation is adopted by the District Judge, then the Clerk shall be directed to unseal Plaintiff's Complaint (Doc. 1), Exhibit A to his Complaint (Doc. 1-1), the Wellstar Defendants' motion to dismiss (Doc. 19), Plaintiff's response to that motion (Doc. 23), and the Wellstar Defendants' reply brief regarding that motion (Doc. 27).

## II.   Motions to Dismiss

### a.  Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To state a claim that can survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and "only a

complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 678-79. To be plausible, the complaint must contain "well-pleaded facts" that "permit the court to infer more than the mere possibility of misconduct." *Id*. at 679.

To survive a motion to dismiss, a complaint "does not need detailed factual allegations," but it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations omitted); *see also Redland Co. v. Bank of Am. Corp.*, 568 F.3d 1232, 1234 (11th Cir. 2009) (explaining that "[t]o survive dismissal, the complaint's allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level; if they do not, the plaintiff's complaint should be dismissed" (internal quotation omitted)).

### b. **Applicable Statutory Frameworks**

Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Disparate treatment can constitute illegal discrimination when 'an employer has treated a particular person less favorably than others because of a protected trait.'" *Uppal v. Hosp. Corp. of Am.*, 482 Fed. App'x. 394, 396 (11th Cir. 2012) (unpublished opinion) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009)). "Although a plaintiff need not satisfy the *McDonnell Douglas* [*v. Green*, 411 U.S. 792 (1973)][1] framework at the pleading stage in order to state a claim of disparate treatment, the 'ordinary rules for assessing the sufficiency of a complaint [still] apply.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002)). "Although a Title VII complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case, it must provide enough factual matter (taken as true) to

---

[1] "Under this framework, the plaintiff must first establish a prima facie case, which creates a presumption of unlawful discrimination against the employee. The employer may then rebut that presumption with legitimate, non-discriminatory reasons for the adverse employment actions. The employee must then proffer sufficient evidence to create a genuine issue of material fact that the defendant's articulated reasons are pretextual." *Uppal*, 482 Fed. App'x at 396 n.1 (citing *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008)). To establish a *prima facie* case of discrimination, a plaintiff must show: (1) that he belongs to a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated people outside of the protected class more favorably; and (4) he was qualified to do the job in question. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).

suggest intentional race discrimination." *Davis v. Coca–Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir.2008) (citations and quotation marks omitted).

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enjoy contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Courts analyze discrimination claims brought pursuant to § 1981 under the same framework as Title VII claims. *Lewis v. MARTA*, 343 Fed. App'x. 450, 453 n.4 (11th Cir. 2009). Unlike Title VII, Section 1981 "provides protection only on the basis of race[.]" *Henley v. Turner Broad. Sys., Inc.*, 267 F.Supp.3d 1341 (N.D. Ga. 2017) (quoting *Rollins v. Ala. Cmty. Coll. Sys.*, 814 F.Supp.2d 1250, 1259 n.1 (M.D. Ala. 2011)).

### c. **Whether Plaintiff has Pled his Race**

As noted above, Plaintiff's Complaint includes claims of race discrimination under Title VII and § 1981 against all defendants. All of the defendants argue in their respective motions to dismiss that Plaintiff has failed to properly plead his race in his Complaint, requiring dismissal of all of his claims. (*See* Doc. 19-1 at 15-16, 18; Doc. 15-1 at 13-14). Those arguments do not warrant dismissal, as Plaintiff's Complaint and his EEOC Charge each sufficiently allege his race.

In his Complaint, Plaintiff alleges that he is "an African doctor of dark skin color" and that "his family is from Nigeria." (Doc. 1 ¶¶ 1, 5).[2] Although those allegations can be read as stating Plaintiff's color and his national origin, they also can be read together as sufficiently pleading his race – African American, or black.

This Court has held multiple times in the context of § 1981 discrimination claims that a plaintiff's allegation that he is of African descent is sufficient to allege the plaintiff's race for purposes of a race discrimination claim. *Florveus v. St. Farm Mut. Auto. Ins. Co.*, No. 1:20-cv-2912-JPB-AJB, 2020 WL 10141277, at * 1, 4 (N.D Ga. Dec. 14, 2020) (citing *Saint Francis Coll. v. Al-Khazaraji*, 481 U.S. 604, 613 (1987)), *adopted by* 2021 WL 2545479 (N.D. Ga. Jan. 4, 2021); *Bazil v. State Farm Mut. Auto. Ins. Co.*, No. 1:20-cv-2914-MHC-RGV, 2021 WL 2452638, at *7-8 (N.D. Ga. Jan. 29, 2021) (citing *Florveus*, 2020 WL 10141277), *adopted by* 2021 WL 2451507 (N.D. Ga. Feb. 17, 2021). Based on that authority, Plaintiff's allegation that he is African but resides in this country, by itself, is enough to properly plead that he is African American, a racial minority group in the United States.

---

[2] Northside argues in its reply brief that the Court should not consider the allegations that Plaintiff is African and of a dark skin color because they are contained in the section of his Complaint entitled "Parties" instead of the section entitled "Factual Allegations." Northside cites no legal basis for such a restrictive reading of Plaintiff's Complaint, and the undersigned refuses to apply such a rule of interpretation.

Further, in *Saint Francis*, cited by all the defendants, the Supreme Court stated that § 1981 "at a minimum reaches discrimination against an individual because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of homosapiens." *Saint Francis*, 481 U.S. at 613 (internal quotations omitted). The Supreme Court further stated that discrimination based on "ancestry or ethnic characteristics…is racial discrimination that Congress intended § 1981 to forbid…." *Id.* In interpreting the *Saint Francis* case, this Court has found that "[a] person's *color* is closely tied to his ancestry and could result in his being perceived as a 'physiognomically distinctive sub-grouping of homo sapiens', which in turn could be the subject of discrimination." *Walker v. Secretary of Treasury, I.R.S.*, 713 F.Supp. 403, 406 (N.D. Ga. 1989) (emphasis added). Here, Plaintiff's allegations that he is dark-skinned and African, taken together with his allegation that his family is Nigerian (that is, he is of Nigerian descent), can reasonably be read as allegations pertaining to his "ancestry or ethnic characteristics." *Saint Francis*, 481 U.S. at 613. Thus, those allegations are enough to properly plead that he is African American, or black.

Moreover, regardless of whether Plaintiff's allegations in his Complaint can be read together as pleading his race, Plaintiff states in his EEOC Charge against WMG and WHS, attached to his Complaint, that he is Black and African American. There, he states "I am black[,] and he refers to "other African-American physicians",

31

implying that he is African American. (Doc. 1-1 at 7). Thus, even if Plaintiff's Complaint fails contain allegations of his race, the EEOC Charge, taken as true, makes up for that deficiency.

For those reasons, the Court should not dismiss any of Plaintiff's claims on the grounds that he failed to properly plead his race. With that issue resolved, the undersigned addresses the defendants' other arguments separately.

### d.  **WHS and WMGs' Motion to Dismiss (Doc. 19)**

The Wellstar Defendants move to dismiss Plaintiff's Title VII and § 1981 claims against them on a number of grounds. (Doc. 19). For the reasons explained below, the Wellstar Defendants' motion should be granted in part and denied in part.

### i.  **Whether Complaint is a Shotgun Pleading**

The Wellstar Defendants first argue that Plaintiff's entire Complaint should be dismissed as a shotgun pleading, because (1) Plaintiff erroneously refers to WHS and WMG as "defendant Wellstar" throughout the Complaint and incorrectly treats them as one legal entity, making it impossible for the defendants or the Court to determine which entity is being accused of particular actions described in the Complaint; (2) Plaintiff's causes of action consist of "sweeping legal conclusions against WMG and WHS" that do not delineate which entity committed each alleged violation of law; and (3) the Complaint fails to separate his claims into distinct counts, but only states them in separate paragraphs. (Doc. 19-1 at 7-9). In response,

Plaintiff argues that his Complaint is not a shotgun pleading, and he essentially describes his entire theory of liability against the Wellstar Defendants, rehashing many of his allegations from the Complaint (albeit without citation to that document). (Doc. 23-1 at 6-7). Further, he explains that he refers to WHS and WMG collectively as "defendant Wellstar" throughout his Complaint because WHS "controls" WMG, "which is [WHS's] subordinate," and the Wellstar Defendants "were co-employers and acted in concert. The conduct of one is the conduct of the other." (*Id.* at 7). He also contends that the Complaint properly separates his Title VII claims from his § 1981 claims. (*Id.*). In reply, the Wellstar Defendants argue that Plaintiff has not pled any allegations that, if proven, would demonstrate that they were Plaintiff's co-employers, and they again contend that he does not properly separate his Title VII claims from his § 1981 claims. (Doc. 27 at 4-5).

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Moreover, "[a] party must state its claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b). The Eleventh Circuit has repeatedly condemned "shotgun pleadings"—a term that generally refers to complaints that violate either Rule 8(a)(2), Rule 10(b), or both. *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1320 (11th Cir. 2015). The Eleventh Circuit has identified four "rough . . . categories" of shotgun pleadings:

(1) complaints containing multiple counts where each count adopts the allegations of all preceding counts; (2) complaints that are "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action;" (3) complaints that do not separate into different counts each cause of action or claim for relief; and (4) complaints that assert multiple claims against multiple defendants without specifying which defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against. *Id.* at 1321-22. The Eleventh Circuit has advised that "a defendant faced with a shotgun pleading should 'move the court, pursuant to Rule 12(e), to require the plaintiff to file a more definite statement.'" *Id.* at 1321 n.10 (quoting *Anderson v. Dist. Bd. of Trs. Of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cri. 1996)).

The undersigned takes first the Wellstar Defendants' argument that the Complaint is a shotgun pleading because it treats the Wellstar Defendants as one entity. This argument does not require dismissal, because, as Plaintiff argues, his Complaint and the attachments thereto allege that WHS controlled WMG, that they were both his employers acting in concert, and that the conduct of one was the conduct of another at all times relevant to this case. As explained below in the discussion of Plaintiff's Title VII claim, Plaintiff's Complaint and his EEOC Charge sufficiently allege a theory that the Wellstar Defendants were a single entity acting in concert at all times during the events underlying Plaintiff's claims. Therefore,

because it may have been difficult for Plaintiff to know when a person involved in the events underlying this case was acting on behalf of WMG or WHS, at this stage, it is permissible for Plaintiff to refer to the Wellstar Defendants collectively throughout his Complaint and group his factual allegations regarding them together. Similarly, it is permissible at this point for him to plead his causes of action against the Wellstar Defendants collectively. Thus, the Court should not dismiss Plaintiff's Complaint as a shotgun pleading for failing to separate his allegations and claims against the Wellstar Defendants.

Neither should the Court dismiss Plaintiff's Complaint for failing to separate his claims into distinct counts. While Plaintiff's Complaint may fail to comply with the technical requirements of Rule 10(b) and could be more clearly pled, it is clear enough for the Court and the defendants to distinguish Plaintiff's Title VII claims from his § 1981 claims and his claims against the Wellstar Defendants from those against Northside. Further, although his causes of action do not spell out the factual allegations that support each claim, the allegations throughout his Complaint are laid out clearly enough for the Court and the defendants to determine the alleged basis for those causes of action and respond to them. Therefore, the Court should not dismiss Plaintiff's Complaint on the grounds that it is a shotgun pleading or make him replead his Complaint.

### ii.  Title VII Claim against Wellstar Defendants

The Wellstar Defendants argue that Plaintiff's Title VII claim against both of them should be dismissed, because (1) it asserts only legal conclusions and does not specify what "disparate terms and conditions of employment" it is based upon or which entity subjected him to those terms and conditions (Doc. 19-1 at 10-11) (citing Doc. 1 ¶ 71); (2) it impermissibly incorporates each of Plaintiff's enumerated factual allegations without stating which ones specifically apply to Plaintiff's Title VII claim (*id.* at 11-13) (citing Doc. 1 ¶ 67); (3) it does not specifically identify a similarly situated comparator that was treated differently than Plaintiff (*id.* at 13) (citing Doc. 1 ¶ 50); and (4) it does not allege facts showing that WHS was Plaintiff's employer under Title VII or that he had an employee-employer relationship with WHS. (*Id.* at 14-15).

In response, Plaintiff argues that his Complaint does contain specific allegations regarding the "disparate terms and conditions" of his employment, including the Wellstar Defendants' failure to provide him with "staff support", telling him to resign when he complained about the lack of support, issuing him LOIs, placing him on the Action Plan, not allowing him to complete his Action Plan, terminating his employment, and denying him the chance to earn a letter of good standing. (Doc. 23-1 at 8-9). Plaintiff also notes that he alleged the Wellstar Defendants permitted Caucasian doctors to engage in "inappropriate medical practice without" taking similar alleged actions against them, particularly Dr. Parry.

36

(*Id.* at 8-9). Next, Plaintiff argues that he properly pled that both Wellstar Defendants were his employers based upon his "employment contract", referring to the Service Agreement, between him and both of those entities. (*Id.* at 10). Regarding that issue, Plaintiff also contends that the EEOC Charge attached to his complaint "explicates in great detail the co-employment relationship" between the Wellstar Defendants. (*Id.* at 11).

The Wellstar Defendants' first two arguments for dismissal of Plaintiff's Title VII claims against them should be rejected, because they are restatements of their shotgun pleading arguments. While Plaintiff's Title VII claims against the Wellstar Defendants does not spell out the factual allegations that support that claim (Doc. 1 ¶ 71), it is not difficult to determine which allegations from the body of the Complaint are meant to support that claim, as made evident by the discussion below. Therefore, the Court should not dismiss Plaintiff's Title VII claims against the Wellstar Defendants based on the grounds that his cause of action does not specifically state which factual allegations support those claims. The undersigned now addresses the rest of the Wellstar Defendants' arguments for dismissal not previously addressed.

### 1. <u>Plaintiff's Employment Relationship with WHS</u>

Next, the undersigned addresses whether Plaintiff has sufficiently pled that WHS was his employer for purposes of his Title VII claim. Based on Plaintiff's

allegations in his Complaint and the attachment thereto, which the Court can consider, he has sufficiently pled that both Wellstar Defendants were his employers for purposes of his Title VII claims against them.

The Wellstar Defendants argue that Plaintiff did not sufficiently plead that WHS was his employer under Title VII because his Complaint never identified WHS as his employer or alleged that he and WHS had an "employment relationship." (Doc. 19-1 at 14-15). They assert that Plaintiff's Complaint only alleges that WMG and WHS are "employers conducting business within this judicial district" (Doc. 1 ¶ 2) and that he "signed a Physician's Service Agreement with defendants Wellstar to lead their Neurosurgery line of service at Wellstar Cobb Hospital" on March 19, 2018 (*Id.* ¶ 8). They argue that the Service Agreement clearly shows that WHS was not Plaintiff's employer. (Doc. 19-1 at 15). In response, Plaintiff contends that the Service Agreement supports a conclusion that he was employed by both Wellstar Defendants. (Doc. 23-1 at 10-11). Moreover, he argues that his EEOC Charge, attached to his Complaint, explains the interrelationship between the two Wellstar Defendants and supports a conclusion that they were both his employers. (*Id.* at 11).

The EEOC charge, which the Court can consider at this stage of the litigation, asserts that the Wellstar Defendants were Plaintiff's "joint employers" and an "integrated enterprise" at all times relevant to this case. (Doc. 1-1 at 7). Those are terms of art used by federal courts to determine when two defendants are both

considered a plaintiff's employers for purposes of Title VII. The Eleventh Circuit has identified three different circumstances in which a plaintiff may be considered to have multiple employers under Title VII. *Lyes v. City of Riviera Beach, Fla.* 166 F.3d 1332, 1341 (11th Cir. 1999). First, under the "single employee" or "integrated enterprise" test, "where two ostensibly separate entities are highly integrated with respect to ownership and operations, we may count them together under Title VII." *Id.* (citing *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987) (internal quotations omitted)). That test considers four factors: "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control." *Id.* (citing *McKenzie*, 834 F.2d at 933). Second, under the "joint employer" test, two entities can be treated as joint employers where they "contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees…." *Id.* (citing *Virgo v. Riviera Beach Assoc., Ltd.*, 30 F.3d 1350, 1359-60 (11th Cir. 1994)). Third, under the "agency" test, two entities can be considered a plaintiff's employer where one "delegates sufficient control of some traditional rights over employees to a third party, we may treat the third party as an agent of the employer…." *Id.* (citing *Williams v. City of Montgomery*, 742 F.2d 586, 588, 589 (11th Cir. 1984)).

Plaintiff's EEOC Charge asserts that WMG and WHS acted as an integrated enterprise and his joint employers at all times relevant to this case. (Doc. 1-1 at 7). That charge contends that WHS's website states that it "formed WMG to provide '*hospital-employed* physicians' for its Health System" and that the two entities "share common management, administrative and operational overlap." (*Id.*) (emphasis added). In addition, it asserts that "everyone in management at WMG is also connected to WHS[.]" (*Id.*). For example, Plaintiff asserts there that Dr. Benedict was his supervisor within WMG, oversees WMG's Neurosurgery Division, and works at WHS's Kennestone Hospital. (*Id.*). He also alleges that Dr. Muster, Dr. Benedict's supervisor, is a WMG Pulmonologist and Senior Vice President of Specialty Medical Services. (*Id.*) Within WHS, Plaintiff's supervisory structure included Dr. Jody Hughes, who was Chief of Staff at Wellstar Cobb and Chair of Wellstar Cobb's MEC and who was also employed by WMG as a Pulmonologist, where he was supervised by Dr. Muster. (*Id.* at 7-8). He also asserts that Wellstar Cobb's MEC has "oversight responsibility over all hospital-physician relationships and credentialing" and the Dr. Benedict, his supervisor within WMG, was a member of Wellstar Cobb's MEC. (*Id.*). Further, the Service Agreement between Plaintiff and both Wellstar Defendants states that Plaintiff must "participate in managed care arrangements entered into by [WMG], the System [which refers to WHS and WMG collectively], and its Affiliates (*id.*); participate in on-call scheduling "in accordance

40

with the applicable [WHS] Hospital's Medical Staff Bylaws, Rules, and Regulations" (*id.*); be subject to and comply with the bylaws, policies, rules, and regulations of WMG and WHS when performing services under the contract (*id.* at 21); and maintain hospital credentials and staff membership at a WHS hospital or else be automatically terminated (*id.* at 19, 24). It states that Plaintiff's performance may be assessed in accordance with various policies promulgated by both WMG and WHS. (*Id.* at 24, Section 6.2). It states that Plaintiff will be compensated for services he "renders to the [WMG], System [which includes WHS] and its patients." (*Id.* at 22). Lastly, it states that "[WMG] and/or [WHS]" are responsible for maintaining liability insurance covering Plaintiff, providing him with certain "employee benefits", and "fil[ing] W-2 forms with respect to [Plaintiff's] income…." (*Id.* at 23).

All that information from the EEOC Charge and the Service Agreement, taken as true, plausibly demonstrates that the two Wellstar Defendants are interrelated to some extent in their operations and share common management, and that WHS has some degree of control over the employment relationship between Plaintiff and WMG. In other words, based on that information, it is plausible that WHS and WMG were both Plaintiff's employer under an "integrated enterprise" theory, or in the alternative, a "joint employer" theory. To be sure, the allegations in Plaintiff's EEOC Charge regarding the interrelationship between the Wellstar Defendants and Plaintiff

could be more specific, and some of the language of the Services Agreement does specifically refer only to WMG as Plaintiff's employer. However, Plaintiff's Complaint and the attachments thereto are sufficient to plausibly state that both WHS and WMG were his employers and a single enterprise acting in concert at all times relevant to his claims. That is especially true considering that the issue of whether an entity was an employer under Title VII is "essentially a factual question" that is not usually resolved at the motion to dismiss stage. *Virgo*, 30 F.3d at 1360; *see also*, *Moore v. Baker*, No. 18-00311-KD-B, 2019 U.S. Dist. LEXIS 38628, at *18-19 (S.D. Ala. Mar. 8, 2019) (finding that the plaintiff's "allegations suffice, at this stage of the proceedings, to support a plausible finding" that the defendants "should be aggregated as Plaintiff's 'employer' for Title VII purposes" and noting that "aggregation is a fact-specific inquiry that is often better left to summary judgment"), *adopted by* 2019 U.S. Dist. LEXIS 50315 (S.D. Ala. Mar. 26, 2019); *Follese v. Jassas Capital LLC*, Case No: 2:18-cv-40-FTM, 99MRM, 2019 U.S. Dist. LEXIS 2451, at *10 (M.D. Fla. Jan. 7, 2019) (finding that "Defendants' Motions [for summary judgment] are premature as the parties have not had adequate time to exchange discovery on the extent to which Defendants had interrelated operations when Plaintiff was hired" and explaining that "further discovery is needed before the Court can adequately evaluate the factors to determine whether Defendants were joint employers"); *Rice v. James*, CV 117-039, 2018 U.S. Dist. LEXIS 79111, at *11

(S.D. Ga. May 10, 2018) (finding the plaintiff's allegations of mutual involvement in employment decisions and salary were sufficient to show that the defendants should be treated as a single employer and noting that aggregation is an issue better addressed at summary judgment); *Kingsley v. Tellworks Commc'ns., LLC*, Civil Action No. 1:15-CV-4419-TWT-JSA, 2017 U.S. Dist. LEXIS 92619, at *53 (N.D. Ga. May 24, 2017); ("[T]he question of integrated or joint employment status is a fact-intensive analysis that involves weighing numerous factors and making determinations based on the totality of the circumstances. In this case, where different factors could be seen as pointing in different directions, it is not the province of the Court to declare as a matter of law what the ultimate conclusion should be."); *Duarte v. Perez*, Case No. 6:14-cv-2077-Orl-28TBS, 2015 U.S. Dist. LEXIS 33532, at *12-13 (M.D. Fla. Feb. 25, 2015) (recommending denial of the defendant-employer's motion to dismiss, which was based on lack of joint ownership, where the plaintiff's "allegations of common control and ownership of Defendant corporations" plausibly alleged joint employment), *adopted by* 2015 U.S. Dist. LEXIS 33785 (M.D. Fla. Mar. 17, 2015); *Diaz v. U.S. Century Bank*, Case No. 12-21224-CIV-MORENO, 2012 U.S. Dist. LEXIS 116877, at *10 (S.D. Fla. Aug. 17, 2012) (finding that the plaintiff alleged "more than [] mere formulaic recitations" with regard to whether a joint employment relationship existed under FLSA and noting that "[a]n exhaustive joint employment analysis would thus be premature at

this stage where Plaintiffs have submitted a plausible claim"); *Kaiser v. Trofholz Techs., Inc.*, 935 F. Supp. 2d 1286, 1292-93 (M.D. Ala. 2013) (finding sufficient allegations to sustain joint employment theory at motion to dismiss stage); *Williams v. Ga. Stevedore Ass'n*, Case NO. CV411-284, 2013 U.S. Dist. LEXIS 36857, at *15-16 (S.D. Ga. Mar. 18, 2013) (denying motion to dismiss on basis that the movant was not the plaintiff's employer because the issue "is a fact-intensive inquiry, and one more suited for disposition by this Court on summary judgment than on the current motion to dismiss") (citing *Lyes*, 166 F.3d at 1340-42; *Virgo*, 30 F.3d at 1359-62; *McKenzie*, 834 F.2d at 934); *Wilborn v. S. Union State Cmty. Coll.*, 720 F. Supp. 2d 1274, 1295 (M.D. Ala. 2010) ("Whether an entity 'retained sufficient control [to be considered a joint employer] is essentially a factual question.' ") (quoting *Virgo*, 30 F.3d at 1360).

The Wellstar Defendants' authority on this issue is unpersuasive. In *Cody v. Palmyra Park Hospital, Inc.*, No. 1:08-CV-88 (WLS), 2009 WL 10674409, at *2 (M.D. Ga. Mar. 31, 2009), *aff'd*, 398 Fed. App'x 556 (11th Cir. 2020), a district court granted a defendant's motion to dismiss the plaintiff's discrimination claims because the plaintiff alleged that the two defendant were a "single entity such that both were her employers" without including "any allegations to support [that] conclusion." However, as discussed above, the attachments to Plaintiff's Complaint here, which the Court can consider at this stage, provide support for Plaintiff's theory

that he was employed by both Wellstar Defendants. Next, in *Brown v. OOGP*, 2:17-cv-1982-ACA, 2018 WL 5084843, at *3 (N.D. Ala. Oct. 18, 2018), a district court in this circuit also dismissed a plaintiff's discrimination claim against one defendant, because the plaintiff failed to assert facts supporting her allegation of that the defendant was her joint employer with another defendant. In that case, there was one factual allegation regarding the defendant who was dismissed. *Id.* Here, attachments to Plaintiff's Complaint go far deeper than that into the relationship between the Wellstar Defendants. Lastly, in *Avery v. City of Covington, Ga.*, No. 1:18-cv-5417-JPB-CCB, 2020 WL 10054679, at *5 (N.D. Ga. Jan. 22, 2020), this Court dismissed a plaintiff's Title VII claims against a defendant-city because he failed to support his allegations that the city was his joint employer along with another defendant, a county government. However, that case is inapplicable here, as it involved a determination of whether two government entities could be considered joint employers, which is a more demanding standard than the one applied to private entities. *Id.* at *5-6 (citing *Lyes*, 166 F.3d at 1345).

For all those reasons, Plaintiff's Complaint and the documents attached to the Complaint sufficiently allege that the Wellstar Defendants were both Plaintiff's employers under Title VII at all times relevant to this case, and this claim should proceed against both of those defendants.

## 2.  Adverse Employment Actions Against Plaintiff

Next, in their initial brief, the Wellstar Defendants attack Plaintiff's Title VII claims against them on the grounds that his Title VII cause of action did not specify which allegations constituted adverse actions that affected the terms and conditions of his employment. (Doc. 19-1 at 11-12). In response, Plaintiff lists the specific actions by the Wellstar Defendants that he alleges to be material adverse actions under Title VII, including their failure to provide him with "staff support", telling him to resign when he complained about the lack of support, issuing him LOIs, placing him on an Action Plan, not allowing him to complete his Action Plan, terminating his employment, and denying him the chance to earn a letter of good standing. (Doc. 23-1 at 8-9). In reply, the Wellstar Defendants contend that none of the actions Plaintiff points to were materially adverse under Title VII. (Doc. 27 at 7-9).

"When a complained-of adverse employment action is not an 'ultimate employment decision,' such as a termination, failure to hire, or demotion, the conduct at issue must substantially alter 'the employee's compensation, terms, conditions, or privileges o[f] employment, [or] deprive him or her of employment opportunities.' " *McQueen v. Ala. Dep't of Trans.*, 769 Fed. App'x 816, 821 (11th Cir. 2019) (quoting *Crawford*, 529 F.3d at 970–73 (quotation marks omitted)). "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms,

conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001), *overruled on other grounds by Burlington Northern v. White*, 548 U.S. 53, (2006). "[T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.* "[C]ourts are wisely reluctant to treat job performance memoranda as actionable under Title VII where they do not trigger any more tangible form of adverse action such as a loss in benefits, ineligibility for promotional opportunities, or more formal discipline." *Id.* at 1241. With that authority in mind, the undersigned takes Plaintiff's alleged adverse employments actions in turn.

Plaintiff alleges he was terminated from his employment with the Wellstar Defendants. (Doc. 1 ¶ 41). It is clear that Plaintiff's termination was an adverse employment action, as it was an "ultimate employment action" that negatively affected Plaintiff.

Next, Plaintiff alleges that he complained to Dr. Muster that he was not receiving proper support in his neurosurgeon role. (Doc. 1 ¶¶ 15-16). He also alleges that, in response, instead of agreeing to provide Plaintiff with more support, Dr. Muster told him he could resign. (*Id.* ¶ 17). Taking those allegations as true, they do not constitute adverse employment actions under Title VII. Plaintiff does not allege or explain how they substantially affected his compensation, the terms of his employment, or deprived him of employment opportunity. At least one court in this

circuit has held that failing to provide support in response to an employee's request is not an adverse employment action under Title VII. *See Brown v. Sybase, Inc.*, 287 F. Supp. 2d 1330, 1339-1343 (S.D. Fla. 2003) (finding that the following alleged actions were not adverse employment actions under Title VII: "(i) the unequal distribution of sales leads; (ii) the lack of notice of the territory assignment change; (iii) placement on a thirty-day PIP; and (iv) a host of other incidents, including [employer's] failure to respond to [plaintiff's] requests for assistance"). Further, there are no allegations that Plaintiff actually did resign or that he was constructively discharged when Dr. Muster told him to resign. Thus, that action, standing alone, was not an adverse employment action, and Plaintiff's Title VII claims cannot proceed on those grounds.

Next, Plaintiff alleges that he received multiple LOIs sometime in 2018, several months after he had been hired (Doc. 1 ¶ 11). In August 2019, "based on the number of [LOIs]" involving Plaintiff, and at Dr. Benedict's behest, Plaintiff was placed on an Action Plan. (*Id.* ¶ 24). The Eleventh Circuit and district courts within this circuit have held that neither negative performance evaluations, which is essentially what Plaintiff's LOIs were, nor placement on performance improvement plans such as Plaintiff's Action Plan, constitute adverse employment actions if they are not accompanied by some tangible impact on the terms or conditions of employment. *Davis*, 245 F.3d at 1241-42 (collecting cases stating that negative

performance reviews not actionable under Title VII); *Rowell v. Metropolitan Life Ins. Co.*, No. 1:12-cv-0491-WSD, 2013 WL 6080274, at *3 (N.D. Ga. Nov. 18, 2013) (holding that placement on a performance improvement plan was not actionable under Title VII where it was not accompanied by a tangible impact on the plaintiff's employment), *aff'd*, 579 Fed. App'x 805 (11th Cir. 2014); *Brown*, 287 F.Supp.2d at 1341; *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) ("Negative performance evaluations, standing alone, do not constitute adverse employment action…."). Thus, the Wellstar Defendants did not take material adverse employment actions against Plaintiff by issuing him LOIs documenting complaints about his performance or placing him on an Action Plan, as neither of those actions by themselves substantially impacted his employment. However, that is not to say that those matters are completely irrelevant to Plaintiff's claims. To the extent that the LOIs or the Action Plan were issued to pretextually provide a justification for Plaintiff's termination, those actions could be considered in conjunction with Plaintiff's termination as substantially impacting Plaintiff's employment. In that sense, they could constitute adverse employment actions under Title VII.

Lastly, Plaintiff alleges that he was not allowed to complete his Action Plan and therefore could not obtain a letter in good standing from the Wellstar Defendants, which in turn harmed his ability to obtain comparable employment after

his termination. (Doc. 1 ¶¶ 46-53). Because Plaintiff alleges that the Wellstar Defendants' refusal to issue him a letter of good standing directly impacted his ability to obtain comparable employment after his termination, he has sufficiently alleged that action deprived him of "employment opportunities." Therefore, he has plausibly alleged that the Wellstar Defendants' failure to issue him a letter of good standing was an adverse employment action under Title VII. *See McQueen*, 769 Fed. App'x at 821; *Crawford*, 529 F.3d at 970. However, as explained below, Plaintiff's Title VII claim should not proceed based on this alleged adverse action, because he does not properly plead a similarly situated comparator as it related to this adverse action.

### 3.  Plaintiff's Alleged Comparator

The Wellstar Defendants also argue that Plaintiff's Title VII claim fails because he does not specifically identify a similarly situated comparator that was treated more favorably than him. (Doc. 23-1 at 13) (citing Doc. 1 ¶ 50). In doing so, the Wellstar Defendants ignore Plaintiff's allegations regarding Dr. Parry. Plaintiff alleges that Dr. Parry was a white neurosurgeon who was responsible for an unnecessary emergency surgery on a particular patient. (Doc. 1 ¶¶ 26-27). Plaintiff alleges he made Dr. Benedict and Dr. Muster aware of Dr. Parry's alleged mistake, but that they did not "initiate any review of [that] case." (*Id.* ¶ 28). Plaintiff later alleged that "white doctors with performance concerns similar to those noted for

[himself]" were not terminated from employment with the Wellstar Defendants. (*Id.* ¶ 50).

Those allegations establish that Dr. Parry is Caucasian, and therefore not the same race as Plaintiff. Further, the Court can reasonably infer from those allegations that Dr. Parry was a neurosurgeon under the authority of Dr. Benedict and Dr. Muster, like Plaintiff, and therefore likely subject to the same rules and performance standards as Plaintiff. He then states that Dr. Benedict and Dr. Muster had knowledge that Dr. Parry caused an allegedly unnecessary emergency surgery, but they did not subject him to any performance reviews, unlike the LOIs and Action Plan that Plaintiff endured. Further, it is reasonable to infer that Plaintiff was referring to Dr. Parry when he alleged that the Wellstar Defendants did not "similarly separate white doctors with performance concerns similar to those" of Plaintiff. (*Id.* ¶ 50). Based on all those allegations, Plaintiff's Complaint plausibly identifies a similarly situated non-black comparator who purportedly made a mistake when administering care to a patient but was not subjected to the same adverse actions as Plaintiff for his purported mistake, including receiving LOIs, being placed on an Action Plan, or being terminated. Thus, Plaintiff's Title VII claims against the Wellstar Defendants should not be dismissed for failing to plausibly identify a similarly situated comparator outside of his protected classes.

On the other hand, Plaintiff does not allege that Dr. Parry ever sought or was given a letter in good standing, or that the Wellstar Defendants otherwise ever did anything to aid Dr. Parry in pursuing other employment opportunities. Thus, the Court cannot conclude that Dr. Parry was ever treated more favorably than Plaintiff in regard to that particular adverse action. Therefore, Plaintiff has not stated a Title VII claim of race discrimination based on that particular adverse action.

In sum, the Wellstar Defendants' motion to dismiss Plaintiff's Title VII claims against them should be denied in part and those claims should be allowed to proceed to the extent they are based on Plaintiff's termination, his receipt of LOIs, and his placement on an Action Plan, in accordance with the above analysis. The Wellstar Defendants' motion to dismiss his Title VII claims should be granted in part and those claims should be dismissed to the extent they are based on any other alleged action by the Wellstar Defendants.

### iii.  § 1981 Claim against WHS and WMG

The Wellstar Defendants also argue that Plaintiffs § 1981 claims because (1) they "are nothing other than mere legal conclusions" (Doc. 19-1 at 17-18) (citing Doc. 1 ¶¶ 4, 68-69); (2) they are pled in a shotgun fashion (*id.* at 18); and (3) he failed to properly plead that his race was the "but-for" cause of their alleged discriminatory actions (*id.* at 18-19). The undersigned disagrees.

As an initial matter, for reasons explained above in the discussion of the Wellstar Defendants' stand-alone shotgun pleading arguments, the Court should not dismiss any of Plaintiff's claims on the basis that they are pled in a shotgun fashion. Furthermore, because Title VII and § 1981 are analyzed under the same framework and have the same substantive elements, *Lewis*, 343 Fed. App'x at 453 n.4, Plaintiff's § 1981 claims against the Wellstar Defendants should survive their motion to dismiss to the same extent as his Title VII claims against them. The Wellstar Defendants' motion to dismiss Plaintiff's § 1981 claims against them should be denied in part and those claims should be allowed to proceed on the grounds that Plaintiff received LOIs, was placed on an Action Plan, and was eventually terminated while his Caucasian comparator, Dr. Parry, was not treated as such. The Wellstar Defendants' motion to dismiss Plaintiff's § 1981 claims against them should be granted in part and those claims should be dismissed to the extent they are based on any other alleged adverse action.

Lastly, the undersigned is not convinced by the Wellstar Defendants' argument that Plaintiff's Complaint does not sufficiently plead that his race was the but-for cause of the adverse actions he suffered. The Supreme Court has held that in order to prevail on a § 1981 claim, "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Assoc. of Afr. Am.-Owned Media.*, 140 S.Ct. 1009,

1019 (2021). And it is true that Plaintiff does not explicitly say anywhere in his Complaint that his race was the "but-for cause" of any decisions of the Wellstar Defendants. (*See* Doc. 1). However, the undersigned does not read *Comcast Corp.* as requiring that Plaintiff used the magic words "but-for" anywhere in his Complaint in order to properly plead a § 1981 claim. The Eleventh Circuit has interpreted that standard to mean that the discriminatory conduct had a "determinative influence" on the injury in question. *Ziyadat v. Diamondrock Hospitality Co.*, 3 F.4th 1291, 1297-98 (11th Cir. 2021) (citing *Comcast Corp.* 140 S.Ct. at 1014; *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336 (11th Cir. 2013)). In *Ziyadat*, the Eleventh Circuit evaluated a plaintiff's complaint to see if he stated a § 1981 discrimination claim, focusing on the but-for causation element. *Id.* In doing so, the *Ziyadat* court did not ask whether the plaintiff had used the exact phrase "but-for", but analyzed the plaintiff's substantive allegations and determined that the alleged discriminatory conduct had a "determinative influence on, and thus was the but-for cause," of the adverse action in question there. *Id.* at 1298. Here, through circumstantial allegations showing that he was subjected to adverse actions and treated less favorably than a similarly situated white employee, Plaintiff's Complaint sufficiently states that race and/or color discrimination, and nothing else, was the cause of him being issued LOIs, being placed on an Action Plan, and being terminated. Thus, under the facts alleged

by Plaintiff, discrimination was the only determinative influence, and therefore the but-for cause, of the injuries he suffered.

For all those reasons, it is **RECOMMENDED** that the Wellstar Defendants' motion to dismiss Plaintiff's claims against them be **GRANTED in part and DENIED in part**. Plaintiff's claims against those defendants should survive to the extent they are based on his receipt of LOIs, his placement on an Action Plan, and his termination from employment with the Wellstar Defendants, and they should be dismissed to the extent they are based on any other alleged adverse action.

### e.  Northside's Motion to Dismiss (Doc. 15).

Northside also filed a motion to dismiss Plaintiff's Title VII and § 1981 claims against. (Doc. 15). That motion should be granted and Plaintiff's claims against Northside dismissed.

### i.  Plaintiff's Title VII Claim against Northside

Northside argues that Plaintiff's Title VII discrimination claim against it should be dismissed "based on lack of subjection matter jurisdiction and failure to state a claim because [P]laintiff did not plead or satisfy that all conditions precedent to the institution of the lawsuit against [Northside] have been fulfilled pursuant to Fed. R. Civ. P. 9(c)." (Doc. 15-1 at 6). In response, Plaintiff states that he "does not assert any claim arising under Title VII against Defendant Northside…." (Doc. 22-1 at 3). In his Complaint, Plaintiff does appear to allege a Title VII claim for race

and color discrimination against "defendants", which includes Northside. (Doc. 1 ¶ 71). Regardless, Plaintiff has made it clear that he has abandoned any Title VII claim against Northside. It is therefore **RECOMMENDED** that Northside's motion to dismiss be **GRANTED** as to Plaintiff's Title VII claim against it.

### ii.   Plaintiff's § 1981 Claim Against Northside

Northside also argues that Plaintiff's § 1981 race discrimination claim against it should be dismissed. (Doc. 15-1 at 12-17). Specifically, Northside argues that that this claim should be dismissed because Plaintiff fails to "provide enough factual matter (taken as true) to suggest intentional…discrimination." (Doc. 15-1 at 14) (quoting *Gonta v. Nations*, No. 5:19-cv-565-TKW/MJF, 2021 WL 2905424, at *6 (N.D. Fla. June 15, 2021)). Northside contends Plaintiff has not alleged facts "which indicate that [its] action was motivated by his race…or that his race played any part in [its] decision not to offer him a full-time position." (Doc. 15-1 at 14). In its reply brief, Northside reiterates that Plaintiff's allegations that Dr. Winograd was offered an available full-time position instead of Plaintiff, without more, are insufficient to show that Plaintiff was discriminated against because of his race. (Doc. 25 at 7). Northside argues that Plaintiff's allegations about the difference between his own experience, record of performance, and qualifications compared to those of Dr. Winograd are conclusory, and it notes that Plaintiff does not allege whether him and Dr. Winograd were "subject to the same locum tenens contract" or "both engaged in

the same type of work." (*Id.* at 7-9). It also contends that Plaintiff's allegations regarding the position, or multiple positions, that he wanted to be hired into are too vague and conclusory, as he does not describe any position with specificity, does not say whether other candidates were considered or hired into any position besides the one Dr. Winograd was awarded, or whether he specifically requested any particular available position out of the multiple positions available "within his specialty." (*Id.* at 8). Lastly, Northside contends Plaintiff has not sufficiently pled intentional discrimination because he has not even specifically alleged the decision-makers responsible for the adverse decision against him. (*Id.* at 10). Northside is correct that Plaintiff's allegations are too vague and conclusory to plausibly plead intentional discrimination based on his race.

Based on Plaintiff's allegations, it is clear he is attempting to plead a circumstantial theory of discrimination by alleging that he was treated less favorably than a similarly situated Caucasian comparator, Dr. Winograd, when seeking a permanent position at Northside. However, Plaintiff's allegations are too vague as to the positions he sought to fill, whether similarly situated comparators existed as to all but one of the positions, or how he and Dr. Winograd were similarly situated so as to plausibly create an inference that the more favorable treatment of Dr. Winograd was caused by racial discrimination.

As an initial matter, Plaintiff alleges that there were multiple vacant positions at Northside "within his specialty" during the time in question and that he had requested to be considered "for an available position in" some non-specific department. (Doc. 1 ¶ 57). Putting aside the position eventually filled by Dr. Winograd for the moment, Plaintiff has failed to state a claim of discrimination regarding Northside's failure to hire him into any of the other alleged vacant positions "in his specialty" at the time, because he does not allege that a similarly situated comparator was treated more favorably than him in relation to those positions. He does not allege that any of those other vacancies were filled, much less by doctors outside of his protected class that were similarly situated to him in any way. Neither does he allege that Northside continued to try to fill those alleged vacancies after he was told he would not be receiving full-time employment. (*See* Doc. 1). Without such allegations, the Court cannot conclude that Northside's decision to not hire Plaintiff into any of those vacancies was the result of discriminatory intent. Thus, Plaintiff has failed to state a claim of discrimination under § 1981based on Northside's failure to hire him into any alleged vacant neurosurgeon positions in the fall of 2020.

Further, Plaintiff does not state a claim of discrimination based on the position that Dr. Winograd was hired into, because he has not plausibly alleged facts from which the Court can infer that Dr. Winograd was similarly situated to him in several

material respects. Plaintiff's allegations cannot be read to infer that Dr. Winograd was hired into a specific job vacancy in which Plaintiff expressed interest. Plaintiff alleges that "instead of offering him an available full-time position, [] Northside offered it to a [Dr. Winograd], who had also worked as a Locums Tenens, but lacked [P]laintiff's practice experience and demonstrated competency while in [Northside's] employment." (Doc. 1 ¶ 62). But nowhere in Plaintiff's Complaint does he allege whether Dr. Winograd was hired into a specific position that Plaintiff had applied to or expressed interest in. Nor does he allege what Dr. Winograd's medical specialty was, which would allow the Court to infer what type of position Dr. Winograd was hired into. Instead, Plaintiff only alleges that he was not hired into any available positions that he sought, and Dr. Winograd was given an available full-time position. Without more, those allegations are insufficient to plausibly state that he and Dr. Winograd were even being considered for the same position, and therefore they cannot support a conclusion that Northside did not hire Plaintiff into whatever position Dr. Winograd was hired into because of Plaintiff's race. *See Kidd v. Jasper*, No. 6:17-cv-1180-TMP, 2018 U.S. Dist. LEXIS 96650, at *11 (N.D. Ala. Jun. 8, 2018) (dismissing a plaintiff's race discrimination claim based on a termination because he only alleged that two white people were hired into non-specific positions after he was terminated, not that they were hired into his position or to otherwise replace him).

In addition, Plaintiff's allegations as to his superior qualifications and experience compared to Dr. Winograd's are too vague and conclusory to plausibly state that he and Dr. Winograd were similarly situated in material respects. Plaintiff simply alleges that Dr. Winograd was hired into an available position and that he was not "despite his superior qualifications and proven record of performance" and despite Dr. Winograd "lack[ing] [P]laintiff's practice experience and demonstrated competency while in [Northside's] employment." (*Id.* ¶ 62). However, Plaintiff does not elaborate on what the qualifications for the position in question were or how his qualifications were superior to those of Dr. Winograd. He also does not describe how his record or performance or practice experience were equal or superior to those of Dr. Winograd. Plaintiff does include allegations about various accomplishments or activities he performed during the term of his *locums tenens* contract with Northside, such as working to mend the relationship between the Neurosurgery and Radiology Departments, attending meetings to help the hospital maintain its trauma designation, and taking more calls than other physicians (*id.* ¶¶ 59-61), but he does not allege that those things were relevant to the qualifications for the positions he did not receive or the position that Dr. Winograd did receive. For those reasons, Plaintiff has not sufficiently alleged that he and Dr. Winograd were similarly situated in any particular way that was relevant to Northside's decision not to hire him into

a neurosurgery position there. As a result, he does not state a claim of race discrimination based on Northside's failure to hire him.[3]

In sum, Plaintiff fails to state a claim for race discrimination based on Northside's failure to hire him into a full-time position, because he does not sufficiently allege that there were similarly situated comparators treated more favorably than him regarding any of the vacant positions that he purportedly sought. Thus, he has not plausibly alleged that race discrimination was the but-for cause of Northside's decision not to hire him . For those reasons, it is **RECOMMENDED** that Northside's motion to dismiss be **GRANTED** and that Plaintiff's § 1981 claim against it be **DISMISSED**.

## <u>Summary</u>

In sum, it is **RECOMMENDED** that the Wellstar Defendants' Motion to Seal (Doc. 9) be **DENIED**. If that recommendation is adopted by the District Judge, then the Clerk should be directed to unseal Plaintiff's Complaint, Exhibit A to his

---

[3] Northside's final argument for dismissal of Plaintiff's claim against it is unconvincing. Northside argues that Plaintiff's claim fails because it is based on the faulty premise that he had a contractual right to full-time employment with Northside contingent upon his satisfactory performance in his *locums tenens* position. (Doc. 15-1 at 15-17). The undersigned does not read Plaintiff's claim as being based on the theory that he was entitled to full-time employment upon completion of his *locums tenens* contract. He simply bases his claim on an alleged infringement of his right to freely contract for full-time employment due to racial discrimination. However, as explained above, Plaintiff has failed to state such a claim for other reasons.

Complaint, the Wellstar Defendants' motion to dismiss, Plaintiff's response to that motion, and the Wellstar Defendants' reply brief regarding that motion.

It is further **RECOMMENDED** that the Wellstar Defendants' Motion to Dismiss (Doc. 19) be **GRANTED in part and DENIED in part.** Plaintiff's Title VII and § 1981 claims should survive to the extent they are based on his receipt of LOIs, his placement on an Action Plan, and his termination from employment with the Wellstar Defendants, and they should be **DISMISSED** to the extent they are based on any other alleged adverse actions.

It is further **RECOMMENDED** that Northside's Motion to Dismiss (Doc. 15) be **GRANTED**.

**IT IS SO REPORTED AND RECOMMENDED** this 12th day of July, 2022.

/s/ J. Clay Fuller
J. Clay Fuller
United States Magistrate Judge